Louis Schwartz and Bette Schwartz v. Commissioner.
Schwartz v. Commissioner
Docket No. 94728.
United States Tax Court
T.C. Memo 1964-247; 1964 Tax Ct. Memo LEXIS 91; 23 T.C.M. (CCH) 1481; T.C.M. (RIA) 64247; September 22, 1964
*91 Deduction: Nonbusiness debts. - Held, that petitioner's loans to a corporation were not proximately related to any trade or business of petitioner and therefore constituted a nonbusiness debt. Further, held, that since such nonbusiness debt did not become wholly worthless in the taxable year 1958, no amount is allowable as a deduction for that year. Deduction: Loss. - Held, that a corporation's note evidencing its debt to petitioner was a capital asset which was sold or exchanged by petitioner in 1958, resulting in a capital loss and not an ordinary loss incurred in trade or business. Gerald A. Gleeson, Jr., 1421 Chestnut St., Philadelphia, Pa., for the petitioners. Albert Squire, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined income tax deficiencies against petitioners for the calendar years and in the amounts, as follows: 1955
$3,720.37
1956
3,263.81
1958
361.63
$7,345.81 The deficiencies for the years 1955 and 1956 are due solely to respondent's denial of a tentatively allowed carryback of a claimed net operating loss for 1958. Petitioners assign errors in the respondent's disallowance of claimed deductions: (1) For a business bad *92 debt in the amount of $14,000 in 1958, the loss from which is alleged to have been incurred in the trade or business of Louis Schwartz and resulting from his loans to Castle Stone, Inc.; (2) for an ordinary loss in the amount of $19,781 in 1958, alleged to have been incurred in the trade or business of Louis Schwartz and resulting from his loan to 608 Hamilton Street Corporation; and (3) for each of the years 1955 and 1956 a net operating loss carryback from 1958, resulting from the above alleged deductible loss and bad debt. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. General Facts Petitioners, Louis Schwartz and Bette Schwartz (also known as Betty Schwartz), are husband and wife residing in Allentown, Pennsylvania. They filed a joint individual Federal income tax return for each of the calendar years 1955, 1956, and 1958 with the district director of internal revenue, Philadelphia, Pennsylvania. Hereinafter, Louis Schwartz will be referred to as the petitioner. Prior to the 1950's, petitioner became financially interested, from time to time, in several different business *93 enterprises, as a sole proprietor, partnership member or stockholder. During the period from 1948 to 1954 petitioner was a member of the partnership of Roth and Schwartz which engaged in the business of the construction and sale of individual homes and built and sold approximately 70 houses in and around Allentown during those years. In connection therewith, petitioner procured the necessary financing and actively supervised the construction work by subcontractors and, also, the sales by real estate agents. After dissolution of the Roth and Schwartz partnership in 1954, petitioner continued his activities in the construction of singlefamily homes and other buildings as a sole proprietorship styled Lou Schwartz, Builder. In connection therewith he procured all the necessary financing, supervised the construction work by contractors and, also, the sales by real estate agents. Up to about 1956 or 1957 petitioner built and sold approximately 36 homes. Sometime prior to the end of 1955, petitioner purchased a burnt-out auto accessory store building located at 1041 Hamilton Street, Allentown, and renovated and remodeled it as an office building. He received rental income therefrom during *94 each of the years 1955 to 1958, inclusive. Sometime prior to the end of 1956, petitioner acquired a lot and built a new office building at 502 Union Boulevard, for rental by the All-State Insurance Co. He received rental income therefrom during each of the years 1956 to 1958, inclusive. Both of those office buildings were listed for sale with real estate brokers, but were still owned jointly by petitioner and his wife throughout the taxable year 1958. Also, petitioner and his wife jointly owned two other Allentown rental properties and received rental income therefrom, namely, 1041 Court Street during 1955 through 1958, and 1219 1/2 Walnut Street during 1957 and 1958. Beginning in 1954 and continuing throughout 1958, petitioner was a stockholder and an officer of the Crystal Construction Company, a Pennsylvania corporation organized in 1954. That company engaged in the business of repair and renovation of houses in and around Allentown. As an officer of the company, petitioner spent about one-half to three-quarters of an hour a day for three or four days a week at the office of that company, advising with respect to estimates of the cost on repair jobs and the purchase of materials *95 required. Also, he procured the financing where necessary, occasionally inspected jobs, and attended sales meetings. On his tax returns petitioner reported a salary from Crystal for only two years, namely, $1,000 for 1956 and $500 for 1958. The record does not disclose the amount of petitioner's investment in Crystal. The company paid no dividends. Beginning in 1952 and continuing throughout 1958, petitioner was a stockholder and officer of the S & R Development Corporation which was organized in 1952. That company engaged in the business of buying and subdividing land, the installation of streets and utilities, the sale of lots, and the construction of houses for purchasers of lots. The company had no payroll and subcontracted all of its work. Sales were made through real estate agencies. As an officer of the company, petitioner engaged the engineers and contractors for the work performed, supervised the work, procured the necessary financing and approved the sales. The record does not disclose how much time petitioner spent in the performance of those duties. Petitioner received no salary and the company paid no dividends during the years 1952 to 1958. The record does not disclose *96 the amount of petitioner's investment in the stock of S & R Development Corporation. In 1958 petitioner became one of the organizers, a stockholder, and an officer of the Pine Grove Water Company, a Pennsylvania corporation organized to supply water to Pine Grove Park, a subdivision developed by the above-mentioned S & R Development Corporation. During 1958 petitioner procured bank loans to the corporation to finance its drilling of a well and installation of pumping facilities and water mains for delivery of water to homes in the subdivision. In 1959 the company received authorization to charge for its services as an organization operated for profit. Petitioner managed the operations of that company during 1958 and 1959, but received no salary for his services. The record does not disclose the amount of petitioner's investment in the Pine Grove Water Company, nor the time he spent working for it. In addition to the above-mentioned activities, petitioner became financially interested in two other corporate enterprises as more particularly hereinafter set forth. Facts Relating to Loans to Castle Stone, Inc. On March 2, 1953, petitioner acquired 50 shares of the total of 350 shares *97 of the authorized and outstanding capital stock of Castle Stone, Inc. (hereinafter referred to as Castle Stone), a Pennsylvania corporation organized on July 16, 1952. In February 1957 Castle Stone redeemed 180 shares of its capital stock and thereafter petitioner owned 50 shares out of a total of 170 shares of its authorized and outstanding capital stock. Castle Stone engaged in the business of manufacturing cast stone produced from a cement mixture pressed into molds and dried. Such products were applied as the outside facing of buildings. Petitioner became the treasurer and a member of the board of directors of Castle Stone, and devoted one-half to three-quarters of an hour a day, three or four times a week, to inspect its products and advise on financial matters. On his tax returns, petitioner reported his salary from Castle Stone in the amounts and for the years as follows: $750 for 1953; $500 for 1954; $250 for 1955; $500 for 1956; and $1,000 for 1957. During 1956 and 1957 Castle Stone required substantial amounts of cash to diversify its operations. Petitioner made personal loans to that company, and the latter made repayments of said loans on the dates and in the amounts, respectively, *98 as follows: Petitioner's Loans
January 22, 1957
$ 5,000
January 27, 1957
5,000
February 14, 1957
10,000
Total
$20,000
Castle Stone Repayments
May 6, 1957
$ 3,000
May 13, 1957
3,000
Total
$ 6,000
During 1956, 1957, and 1958, Castle Stone undertook to advance a line of credit to Lehigh Valley Woodworking Corporation (hereinafter referred to as Lehigh), which manufactured wood mouldings from lumber. Pursuant to a factoring agreement with Lehigh, Castle Stone paid all of Lehigh's bills and payrolls, collected the remittances on its sales, and in return received 6 percent of all of Lehigh's sales. Due to Lehigh's purchases of improper grades of lumber at high prices, its expenses exceeded the sales of mouldings and substantial financial losses were incurred by Castle Stone which became insolvent in 1958. On April 21, 1958, Castle Stone ceased business operations and assigned all of its assets to an assignee for the benefit of creditors. The assignee proceeded to completely liquidate the assets of Castle Stone, and in February 1960 made the final and only distribution to the creditors. In such distribution petitioner received $490 of the amount of $14,000 owed him by Castle Stone. Petitioner's loans made *99 to Castle Stone became partially worthless to the extent of $13,510 in 1958. On his income tax return for 1958, petitioner deducted $14,000 on SCHEDULE C, PROFIT (OR LOSS) FROM BUSINESS OR PROFESSION, line 16, providing for deductions for "Bad debts arising from sales or services." In Schedule C-2, petitioner explained this claimed deduction as follows: "Uncollectible loan - $14,000 Castle Stone Co. (bankrupt)." In the statutory notice of deficiency, the respondent disallowed the claimed bad debt deduction, for the following reason: It has been determined that you are not entitled to a business bad debt deduction in the amount of $14,000 claimed for the taxable year 1958 since the debt was not incurred in your trade or business and is therefore a nonbusiness bad debt. As such, no part of the deduction is allowable in 1958 since the debt did not become wholly worthless in 1958. Facts Relating to Loan to 608 Hamilton Street Corporation The 608 Hamilton Street Corporation (hereinafter referred to as Hamilton) is a Pennsylvania corporation organized in 1945. On December 16, 1955, it had 150 shares of $100 par value common stock authorized and outstanding, and its principal asset was *100 a burned-out theatre building located at 608-610 Hamilton Street, Allentown, Pennsylvania, which was encumbered by a mortgage held by the First National Bank of Allentown, in the unpaid balance of $45,000 as of that date. The balance sheet attached to Hamilton's income tax return for the fiscal year ended September 30, 1956, showed that as of October 1, 1955, Hamilton had a deficit of $54,094.02 in earned surplus and undivided profits. In 1955 a friend interested petitioner in the possibility of rebuilding, renovating, and converting the above-mentioned fire-damaged building into an attractive office building. In connection therewith, it was proposed that petitioner agree to become a stockholder of Hamilton and, also, agree to join in providing the financing required for the reconstruction program. On December 16, 1955, a written agreement was entered into whereby the then owners of the 150 outstanding shares of common stock of Hamilton agreed, inter alia, to sell 75 shares of such stock to petitioner and the other 75 shares to Isabel Senderowitz, Trustee (under a deed of trust dated December 15, 1955, for benefit of her three minor children), at a price of $78.33 per share, with the *101 closing date on February 15, 1956. This agreement was performed in accordance with its terms. On the same date, December 16, 1955, petitioner entered into a written agreement with Isabel's husband, Robert Senderowitz (hereinafter referred to as Senderowitz), which set forth in the preamble, inter alia, that the parties were desirous of providing for the promotion of the interests of Hamilton "by furnishing and securing loans of money to and for Corporation to finance the reconstruction of premises 608-610 Hamilton Street." The agreement provided, inter alia, that Senderowitz advance the sum of $50,000 to pay the purchase price of 150 shares of Hamilton stock (with petitioner owing him $5,874.75 for the cost of petitioner's 75 shares) and the remaining $38,250.50 as a loan to Hamilton; that after consumption of such $50,000 advance, Senderowitz and petitioner jointly lend Hamilton the sum of $100,000 secured by a second mortgage on the premises, it being contemplated that the said mortgage be assigned as collateral security for repayment of a bank loan to them on their individual signatures; and that on or before September 16, 1957, petitioner lend Hamilton the sum of $25,000 evidenced *102 by the corporation's note payable two years after completion of permanent financing on the reconstructed building. Senderowitz advanced the sum of $50,000 for the purposes provided for in the agreement. Pursuant to the agreement, petitioner loaned $25,000 to Hamilton evidenced by the latter's promissory note, dated September 13, 1957, in the principal amount of $25,000 payable 28 months after date. In addition petitioner advanced $500 to Hamilton in 1957, on an open account. Pursuant to the agreement which called for a $100,000 loan to Hamilton by petitioner and Senderowitz, they approached the First National Bank of Allentown (hereinafter referred to as the Bank), to arrange for a loan in that amount plus an additional $25,000 deemed necessary to complete the remodeling and renovation of the building. Petitioner and Senderowitz jointly borrowed $125,000 from the Bank on their personal note and at the same time loaned such sum to Hamilton evidenced by its note payable to them in a like amount secured by a second mortgage on Hamilton's building. The Hamilton note and mortgage were assigned to the Bank by petitioner and Senderowitz as security for the Bank's loan to them. The Bank paid *103 the $125,000 loan directly to Hamilton which in turn made payments of interest and repayments on principal directly to the Bank. The loan from the Bank to the individuals and by them to Hamilton took that form because the Bank refused to lend directly to the corporation on its own credit. The proceeds of the loan were used solely in the reconstruction and renovation of the Hamilton building and were necessary for the completion of such work. In connection with the above-mentioned bank loan or at sometime prior to September 18, 1958, petitioner and Senderowitz guaranteed the Bank payment of the remaining balance of the first mortgage held by the Bank on the premises owned by Hamilton. During the period from the time petitioner became a stockholder of Hamilton until September 18, 1958, he was an officer of the corporation and supervised the reconstruction and renovation program to convert its fire-damaged building into office space. While Hamilton was engaged in its reconstruction and renovation program, a general strike in the building trades forced a stoppage of all work on the building. As a result, completion of the work was delayed and costs for labor and materials increased. The *104 delay caused the loss of some prospective tenants and the increased cost required Hamilton to rent its office space at a rate of $3.25 per square foot per month in order to operate economically. The prevailing rental for office space in Allentown was around $2.50 to $2.60 per square foot, and Hamilton experienced great difficulty in obtaining and holding tenants. In September 1958 only 10 percent of the building was rented. Hamilton's income tax returns for the fiscal years ending September 30, 1956, 1957, and 1958 disclosed that it had gross rental income of $7,980 for 1956, none for 1957, and $7,349.42 for 1958. For those fiscal years its returns reported taxable income (loss) in the amounts of ($4,492.14) for 1956; ($8,697.54) for 1957; and ($13,557.47) for 1958. Advertisements were placed in the New York Times for the sale of Hamilton and its property - lock, stock, and barrel. One of the reasons Senderowitz and petitioner invested in Hamilton was that it had operating losses which they anticipated using as carryover deductions from prospective office rental income, and they hoped to find a purchaser for the same reason. In the latter part of 1958, petitioner feared that Hamilton *105 might become insolvent and that his own credit standing in the community would be destroyed through his connection with a bankrupt concern and his personal liability on the above-mentioned $125,000 bank loan. Petitioner thereupon decided to dispose of all his financial interest in Hamilton and terminate all of his personal obligations in connection therewith. On September 18, 1958, a written contract was entered into between petitioner, Senderowitz, Ralph A. Metzger (hereinafter referred to as Metzger), and Sylvia Metzger (hereinafter referred to as Sylvia), which set forth in the preamble, inter alia, that petitioner was desirous of selling his 75 shares of Hamilton stock and Sylvia was "willing to purchase said stock on the terms and conditions" therein set forth. The agreement provided, inter alia, that petitioner "sell, assign, transfer" and deliver his 75 shares of Hamilton stock to Sylvia for a price of $5,874.75; that petitioner "sell, assign, deliver, and set over unto Senderowitz and Sylvia Metzger, in equal shares, all of his right, title and interest in and to the $25,500 [1] *107 note which Schwartz holds from the corporation, dated September 15, 1957, the notes for $125,000 *106 from the Corporation to Senderowitz and Schwartz, [2] * * * and any other notes which Schwartz holds from the Corporation;" that Metzger "does hereby assume the obligation of paying and discharging all of said Schwartz' obligation" on the notes evidencing the Bank's loan of $125,000 to petitioner and Senderowitz and, also, on petitioner's guarantee to the Bank to pay the remaining balance of $43,200 on the first mortgage held by the Bank on Hamilton's premises together with any interest thereon; and that Senderowitz and Metzger "further agree to obtain, the Bank willing, * * * a release from The First National Bank of Allentown whereby Schwartz is released from any further liability on said notes and mortgage." This agreement was performed in accordance with its terms and conditions. The Bank accepted the substitution of Metzger in place of petitioner as primarily liable on the said notes and as guarantor on the said mortgage and released petitioner from any further liability thereon. On September 18, 1958, the $125,000 loan by the Bank to Senderowitz and petitioner jointly and their loans in that amount to Hamilton, constituted the construction loan and at that time no permanent financing had been arranged, secured by Hamilton's premises. Prior to and on September 18, 1958, the petitioner's loans totalling $25,500 to Hamilton were not due and payable. Petitioner has failed to prove the value of the notes representing such loans and they were therefore not worthless debts, either wholly or in part. On his income tax return for 1958 and with respect to his disposition of the Hamilton stock and its note in the amount of $25,500 pursuant to the agreement of September 18, 1958, petitioner attributed a portion of such amount to a capital loss on the stock and claimed the remainder as an ordinary loss deduction in the amount of $19,781. On Schedule D, "GAINS *108 AND LOSSES FROM SALES OR EXCHANGES OF PROPERTY," attached to his 1958 return, petitioner reported under subschedule, "CAPITAL ASSETS" a long-term capital loss of $5,719 on his shares of Hamilton stock and further reported under subschedule "PROPERTY OTHER THAN CAPITAL ASSETS" an ordinary loss of $19,781 described as "Loan-608 Hamilton St. Corp." That allocation was made by an accountant who prepared petitioner's 1958 return on the basis of information given to him upon petitioner's then mistaken belief that the loans totalling $25,500 embraced an unpaid subscription for Hamilton stock. By letter dated August 31, 1960, to the Internal Revenue Service, the accountant explained that the allocation was in error, that the total amount advanced by petitioner to Hamilton was a loan, and that his stock purchase was a separate transaction. In the statutory notice of deficiency, the respondent disallowed the claimed loss deduction for the following reason: It has been determined that you are not entitled to a loss on the loan to the 608 Hamilton Street Corporation claimed as a loss on the disposition of "PROPERTY OTHER THAN CAPITAL ASSETS" in the amount of $19,781.00 for the taxable year 1958 *109 since this loss is a capital loss under Section 1221 of the Internal Revenue Code of 1954. With respect to the taxable years 1955 and 1956 involved herein, the respondent's notice of deficiency disallowed the claimed net operating loss deduction in each year based on the carryback of a claimed net operating loss in 1958, on the ground that his adjustments for the year 1958 resulted in no net operating loss for 1958. Ultimate Findings During the period of years material herein, embracing several years prior to and including the taxable year 1958, the petitioner was not regularly engaged in the trade or business of promoting or financing corporations as going businesses for sale to customers in the ordinary course of his business and, further, he was not engaged in the trade or business of general financing and moneylending. Petitioner's loans to Castle Stone and also to Hamilton in 1957 were not proximately related to any trade or business engaged in by petitioner, and such loans constituted nonbusiness debts neither of which became wholly worthless in 1958. The Hamilton note evidencing its debt to petitioner was of an unknown value and it was sold or exchanged by petitioner to third *110 parties in 1958. Opinion The asserted deficiencies for 1955 and 1956 are due solely to respondent's disallowance of a claimed net operating loss carryback from the year 1958, and thus hinge upon the determination of the questions involved in the latter taxable year. With respect to the year 1958, the issues presented are (1) whether petitioner's claimed deduction for $14,000 as a business bad debt was erroneously disallowed in toto on the ground that it constituted a nonbusiness bad debt only partially worthless in 1958, and (2) whether petitioner's claimed deduction for $19,781 as an ordinary loss was erroneously disallowed on the ground that the loss was sustained upon the disposition of a capital asset resulting in a capital loss subject to certain prescribed limitations rather than deductible in full. Petitioner contends that the crux of both issues is whether the alleged business bad debt and ordinary loss were both incurred in, or were at least proximately related to, his trade or business regularly carried on prior to and during the years involved. On this question petitioner argues that the instant case is distinguished on its facts from Whipple v. Commissioner, 373 U.S. 193 (1963), *111 vacating and remanding on other grounds and another issue 301 F. 2d 108 (1962), which had affirmed a Memorandum Opinion of this Court. In our opinion the principles announced in the Whipple case, supra, are controlling here. [3] It has now been clearly established that the business of a corporation is its own and not the trade or business of a stockholder even though he is an officer who devotes his time and energy to the conduct of corporate affairs; that the tax statutes' concept of the proximate connection between a fully deductible bad debt and the trade or business of the taxpayer falls far short of reaching every income or profitmaking activity; that investing is not a trade or business, and the return therefrom arises from the corporate business and not the stockholder's business even though substantially the product of his services to the corporation. This is true whether there is just one corporation or many corporations are involved. Furnishing management or other services to a corporate employer does not constitute the operation of a trade or business by a stockholder-investor so as to permit the deductions here sought in the absence of substantial additional evidence of *112 the incidental and proximate relationship of the loans to the taxpayer's trade or business in the tax years involved. The business of promoting corporations is one where the return is other than an investor's return, such as fees, commissions, or profits from the sales of corporations to customers in the regular course of the promoter's business. Even if a taxpayer demonstrates such an independent business activity, bad debt losses arising from his own business must be carefully distinguished from those of an investor participating in the conduct of corporate affairs. Applying the above principles to the facts in the instant case, we find that petitioner's activities with several corporations were those of an investor who also rendered varying degrees of services as an officer. In only two instances did the petitioner become *113 a corporate shareholder-creditor, and those transactions were for the purpose of preserving or enhancing the value of his investment in capital shares. The record herein clearly establishes, and we have found as a fact, that petitioner was not regularly engaged in the business of promoting corporations for sale to others (despite some self-serving testimony to that effect) or in the business of general financing and moneylending. While there is some general evidence that petitioner engaged in various phases of the real estate business over a period of years in proprietorships or partnerships as well as an investor in corporations, we hold that there is no sufficient or substantial evidence to establish proximate relationship between the loans to corporations here involved and any trade or business of the taxpayer. No direct connection between any of the petitioner's various projects or enterprises and the corporations' activities has been shown. True, the general descriptive category of "real estate" would apply to describe the nature of the ventures, but we do not deem this sufficient to create the required proximate relationship. The facts disclosed by this record are clearly distinguishable *114 from those involved in such cases as Maloney v. Spencer, 172 F. 2d 638 (C.A. 9, 1949); Wilfred J. Funk, 35 T.C. 42 (1960); J. T. Dorminey, 26 T.C. 940 (1956); and the other cases on which petitioner relies. Absent such relationship, the bad debts petitioner seeks to deduct cannot be allowed as debts created or acquired in connection with a trade or business of the taxpayer. On his tax return for 1958, petitioner claimed a business bad debt deduction in the amount of $14,000 representing the balance due on his loans to Castle Stone. Since the record shows that the debt became only partially worthless to the extent of $13,510 in 1958, petitioner now contends for a deduction of the latter amount as a partially worthless business bad debt. This contention must be denied. Petitioner offered no evidence of any connection between Castle Stone's business and operations and any of his real estate ventures or activities. It was an isolated business transaction; another investment made by petitioner. On authority of Whipple v. Commissioner, supra, we conclude that petitioner's loans to Castle Stone in 1957 were not proximately related to any trade or business of petitioner and, therefore, *115 constituted a "nonbusiness debt" within the meaning of section 166(d) of the Internal Revenue Code of 1954, [4] *116 subject to prescribed limitations as to allowable deductions on account thereof. Since such nonbusiness debt did not become wholly worthless in the taxable year 1958, no amount is allowable as a deduction for that year. On this issue respondent's disallowance of the entire amount of $14,000 claimed bad debt deduction is sustained. On his tax return for 1958, petitioner claimed an ordinary loss deduction in the amount of $19,781 reported on Schedule D as resulting from the sale or exchange of property other than a capital asset and described as "Loan - 608 Hamilton St. Corp." Such amount is a portion of the total of $25,500 loaned by petitioner to Hamilton in 1957 and evidenced *117 by the latter's note. There is no amended pleading herein to claim a deduction for the full amount of $25,500. Petitioner does not contend that the Hamilton loans constituted a worthless debt, and the evidence of record while failing to show the value thereof clearly establishes that the debt was not worthless in 1958. Petitioner does contend that the Hamilton loans were made in 1957 in connection with his trade or business and that upon the disposition of his Hamilton stock in 1958 he was required to forfeit the note evidencing the Hamilton debt to him and he thereby sustained an ordinary loss incurred in his trade or business and deductible in full within the meaning of section 165(a) and (c) of the Internal Revenue Code of 1954. [5] *118 On brief petitioner also argues that under our decision in J. J. Shea, 36 T.C. 577 (1961) a loss incurred by a taxpayer who pays to be released from his personal guaranty of corporate obligations is an ordinary loss deductible in full under section 165(c)(2) and not a capital loss resulting from the sale or exchange of a capital asset. He concludes that "the same situation presents itself in the instant case," and asserts that the relinquishment by petitioner of his right to repayment of the $25,500 loan to Hamilton was a payment to obtain release from personal liability and thus an ordinary business loss. This issue was not raised by the petition herein, it being there stated only that the claimed loss arose from the transfer of the Hamilton notes by petitioner to a third party "in the normal *119 conduct of petitioner's trade or business." Neither was it contended by petitioner in his counsel's opening statement that any claim was being made for deductibility of the Hamilton note loss on the basis of 165(c)(2), as a loss incurred in a transaction entered into for profit, though not connected with a trade or business. Even in his brief petitioner only refers to J. J. Shea, supra, in an oblique and backhanded manner, and we do not understand him to argue that the Hamilton loss is sought as a deduction because it was incurred in a transaction entered into for profit, though not connected with a trade or business. The whole thrust of petitioner's arguments as disclosed by the pleadings and briefs is that this loss, too, was incurred in the conduct of his trade or business. In any event we could not on the evidence before us allow petitioner an ordinary loss deduction under section 165(c)(2) of the Code because there is absolutely no evidence of the value of the Hamilton note in the record. Had petitioner paid cash to Senderowitz and Metzger to secure his release from all personal liability for Hamilton's debts, then the case before us would be similar to that presented by J. J. Shea, supra, *120 and an ordinary loss deduction might be allowed under section 165(c)(2) of the Code. Cf. also Eugene H. Rietzke, 40 T.C. 443 (1963). Here, however, the only payment made by petitioner to secure his release from liability on corporate debts was by assignment of his corporate notes in the face amount of $25,500. These notes were unsecured and not yet due according to their terms. However, at the time they were transferred Hamilton, the maker, had been losing money, was in financial straits and in petitioner's own words its sole asset was an empty building only 10 percent rented and it "might have to go bankrupt." There is no way we could possibly value these notes on the evidence before us as of September 18, 1958, the date they were transferred and assigned by petitioner to Senderowitz and Metzger to secure his release from liability on his personal guaranty of Hamilton's debts. We cannot therefore measure any loss suffered at that time by petitioner on the theory of J. J. Shea, supra, and Eugene H. Rietzke, supra, because petitioner has failed to meet his burden of proving the amount of such a loss even if we were constrained to allow same. The record herein also fails to establish *121 a factual basis to support the petitioner's contention that the loss is allowable as an ordinary loss under section 165(c)(1) of the Code. Petitioner's loans to Hamilton were not proximately related to any trade or business of petitioner and there was no forfeiture of the debt due petitioner, but instead a sale of the note evidencing the debt. There is no evidence to support petitioner's contention that he was forced or required to transfer the note; he chose to do so for his own reasons. The facts are that in 1958 petitioner entered into a one-package transaction with several parties and to which Hamilton was not a party, whereby petitioner sold all of his shares of Hamilton stock to Sylvia Metzger at the cost price thereof to him; petitioner sold his Hamilton note in the amount of $25,500 to Robert Senderowitz and Sylvia Metzger, in equal shares and they thereby became creditors of Hamilton in such amount; Ralph Metzger assumed the obligation of paying and discharging all of petitioner's primary obligation on notes evidencing the First National Bank's loan of $125,000 to petitioner and Senderowitz jointly and, also, petitioner's guarantee to the Bank to pay the remaining balance *122 of Hamilton's first mortgage on its premises. As our findings indicate petitioner desired to sever his connections with Hamilton and eliminate his personal liability on its loans because of his fears that Hamilton might become insolvent or go bankrupt and thereby damage his credit standing. He decided to pull out of Hamilton because of these developments. The record clearly establishes that petitioner made a disposition of the note evidencing the Hamilton debt by a sale or exchange thereof to third parties in 1958. The note was property held by the petitioner, Ralph Perkins, 41 B.T.A. 1225, 1231 (1940), affd. per curiam 125 F. 2d 150 (C.A. 6, 1942); Maurice Levy, 46 B.T.A. 423 (1942), affd. 131 F. 2d 544 (C.A. 2, 1942), certiorari denied 318 U.S. 780 (1943); and Estate of Clarence E. Lehr, 18 T.C. 373 (1952); and thus constituted a "capital asset" as defined by section 1221 of the Internal Revenue Code of 1954, whether or not connected with his trade or business, unless it falls within the exclusions specifically set forth in that section. The evidence before us fails to support any claim for such exclusion.[6] *124 Accordingly, and pursuant to section 165(f) of the 1954 Code (see *123 footnote 5), petitioner's loss from the sale or exchange of the Hamilton note is allowable as a deduction only as a capital loss subject to the limitations prescribed in sections 1211 and 1212 of the Code, and not as an ordinary loss deductible in full as claimed by petitioner. On this issue the respondent's disallowance of the amount of $19,781, claimed as an ordinary loss deduction, is sustained. Decision will be entered for the respondent. Footnotes
1. Under the facts of records it is clear that this amount embraces the hereinabove-mentioned $25,000 loan by petitioner to Hamilton evidenced by latter's note dated September 13, 1957, plus the additional $500 loaned by petitioner to Hamilton in 1957. 2. The notes evidencing the $125,000 loan jointly made by Senderowitz and petitioner to Hamilton, and which were endorsed by them and deposited with the Bank as security for the latter's loan in that amount to them individually.↩
3. Most of the cases relied upon by petitioner in support of his argument that one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business were disapproved by the Supreme Court in Whipple v. Commissioner, 373 U.S. at 203↩, fn. 10, after petitioner's original brief was filed.
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
5. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * *
(f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.↩
6. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, or similar property, held by - (A) a taxpayer whose personal efforts created such property, or (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property; (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of thedistrict of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩