Jack Schlosser and Dorothy Schlosser v. Commissioner.
Schlosser v. Commissioner
Docket No. 755-64.
United States Tax Court
T.C. Memo 1965-186; 1965 Tax Ct. Memo LEXIS 144; 24 T.C.M. (CCH) 972; T.C.M. (RIA) 65186; July 1, 1965
Joseph H. Crown, 529 Fifth Ave., New York, N. Y., for the petitioners. John E. McDermott, *145 Jr., for the respondent. SCOTT Memorandum Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1961 in the amount of $6,219.22. The issue for decision is whether petitioner Jack Schlosser is entitled to a deduction as an ordinary loss of an amount of $25,000 which he paid to two of the other stockholders of a corporation in which he also held a stock interest, or whether this sum is deductible only as a short-term capital loss under the provisions of section 166(d)(1)(B) of the Internal Revenue Code of 1954 as determined by respondent. All of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Great Neck, New York, filed a joint Federal income tax return for the calendar year 1961 with the district director of internal revenue for the Manhattan district of New York. Petitioners computed their tax liability on the cash basis. Jack Schlosser (hereinafter referred to as petitioner) is employed in the trade or business of being a Certified Public Accountant in New York City. On his income tax return for the calendar year 1961, petitioner *146 reported partnership income from the firm of Eisner & Lubin in the amount of $75,000. This amount plus certain other ordinary income items reported by petitioner resulted in a total ordinary income of $83,228.90 being shown on petitioner's 1961 income tax return. On his return petitioner reported short-term capital gain of $5,273.42 and long-term capital gain of $20,886.68, 50 percent of which was shown to be $10,443.34, which when added to the amount of short-term capital gain reported, resulted in $15,716.76 being reported by petitioner as income from the sale or exchange of property, making total reported income of $98,945.66 prior to reduction by the deductions and personal exemptions claimed by petitioner. Cabral Manufacturing Company (hereinafter referred to as Cabral) was organized on August 1, 1958, under the laws of the State of Rhode Island for the purpose of engaging in the manufacture and sale of costume jewelry, which business it did engage in, its operations being carried on in Pawtucket, Rhode Island. Until July of 1959 all of Cabral's outstanding capital stock, being 300 shares of Class A common stock, was owned by Edythe Winslow, wife of Samuel Winslow, for which *147 $15,000 was paid into the corporation. Samuel Winslow was the president of Cabral during the period of its existence and responsible for its day-by-day operations. Edythe Winslow was secretary and treasurer during the existence of Cabral. Prior to July 31, 1959, Edythe Winslow loaned $10,000 to Cabral. On or about July 31, 1959, petitioner, Leonard Zahn (hereinafter referred to as Zahn or Leonard) and David Igelheimer (hereinafter referred to as Igelheimer) were each issued 100 shares of Cabral's Class B common stock in return for $6,000 or a total of $18,000. Thereafter until February 4, 1960, the stockholders of Cabral were as follows: Stockholders
No. of shares
Edythe M. Winslow
300 - Class A Common
Jack Schlosser
100 - Class B Common
Leonard Zahn
100 - Class B Common
David Igelheimer
100 - Class B Common Class A common stock and class B common stock possessed the same rights and powers with the provision that Class A stockholders and Class B stockholders were each entitled to elect three directors to the board of directors of Cabral. After July 31, 1959, and until February 24, 1960, the directors of Cabral were Samuel Winslow, Edythe Winslow and Alma *148 A. Greenberger, elected by the Class A common stockholders, and petitioner, Zahn, and Igelheimer, elected by the Class B common stockholders. On February 24, 1960, Cabral issued 300 shares of Class A common stock to Evelyne Coppell for $18,000. Thereafter and until the liquidation and dissolution of Cabral the stockholders were petitioner, Zahn and Igelheimer, each with 100 shares of Class B common stock, Evelyne Coppell with 300 shares of Class A common stock, and Edythe Winslow with 300 shares of Class A common stock. After February 24, 1960, Evelyne Coppell and Frederick Coppell, her husband, were directors of Cabral. Also on February 24, 1960, Frederick Coppell became a vice president of Cabral and thereafter participated with Samuel Winslow in its day-by-day operations. In January 1961, Frederick Coppell's employment contract was terminated and he resigned as vice president and director of Cabral. During the period of its existence Cabral on its income tax returns reported the following profits or losses: Fiscal year ended July 31
1959
1960
1961
1962
Gross sales
$89,087.95
$217,407.89
$213,831.52
$340,641.40
Less cost of goods sold
26,642.77
94,646.44
150,654.11
264,285.85
Gross profit from sales
$62,445.18
$122,761.45
$ 63,177.41
$ 76,355.55
Other income
181.41
17.14
(41.48)
489.16
Total income
$62,626.59
$122,778.59
$ 63,135.93
$ 76,844.71
Compensation Samuel Winslow
$ 6,775.00
$ 15,700.00
$ 6,450.00
$ 5,200.00
Compensation Frederick Cop-
pell
6,100.00
6,450.00
2,850.00
Depreciation
1,028.08
2,938.91
6,381.74
7,443.98
Total other deductions
55,313.37
145,315.20
103,698.51
66,805.67
Taxable income (loss) before
net operating loss deduction
(490.06)
(47,275.52)
(59,844.32)
(5,454.94)
*149 Cabral's balance sheets as of the end of each of its fiscal years 1959 through 1962 showed the following assets and liabilities: Fiscal year ended July 31
1959
1960
1961
1962
Assets
Cash
$ 1,773.47
$ 1,029.66
$ 1,458.58
$ 1,864.93
Notes and accounts receivable (less re-
serve for bad debts)
21,088.85
71,362.60
58,018.90
24,190.23
Inventories
19,226.45
46,669.81
86,546.68
16,966.01
Other current assets and prepaid ex-
penses
455.46
1,086.08
971.53
1,642.29
Intangible assets
60.00
30.00
Building and other fixed assets less ac-
cumulated depreciation
7,587.90
21,609.99
27,460.99
21,209.84
Total Assets
$50,132.13
$141,758.14
$174,516.68
$ 65,903.30
Liabilities and Capital
Accounts payable
$22,481.11
$ 79,985.73
$131,154.04
$ 30,879.30
Other current liabilities
3,001.08
3,397.99
14,832.54
12,162.59
Bonds, notes, and mortgages payable
10,140.00
55,140.00
85,140.00
84,926.25
Capital stock (common)
15,000.00
51,000.00
51,000.00
51,000.00
Earned surplus (deficit)
(490.06)
(47,765.58)
(107,609.90)
(113,064.84)
Total liabilities and capital
$50,132.13
$141,758.14
$174,516.68
$ 65,903.30
*150 Cabral did not file an income tax return for its taxable year ended July 31, 1963. At a meeting of the directors and stockholders of Cabral on February 24, 1960, its bylaws were amended so as to provide that the adoption of any matter affecting the business of Cabral required an affirmative vote of 75 percent of all of the issued and outstanding common stock of the corporation. Prior thereto an affirmative vote of a majority of the issued and outstanding common stock sufficed. At this meeting the bylaws were also amended to provide that the number of directors were not to be less than two or more than nine. In May of 1960 Cabral desired to borrow funds, but it was unable to borrow funds. Zahn offered to arrange a loan to Cabral on condition that all of the stockholders agree to guarantee payment of such loan. On May 16, 1960, all of Cabral's stockholders executed in New York City, New York an agreement which provided as follows: We, the undersigned, being all the Stockholders of both Class A and Class B stock of CABRAL MFG. CO., a corporation duly organized under the laws of the State of Rhode Island with principal office in the City of Providence in said State, do hereby *151 jointly and severally agree to and with each other that in the event any one of the Stockholders has loaned or in the future will loan any sums of money to the corporation, as approved by the Board of Directors, and said sum of money so loaned is not repaid by the corporation to the individual stockholder on or before ten (10) days after the naturity of said obligation, that each stockholder as their names appear hereunder shall be jointly and severally responsible to the individual lending stockholder for their respective proportionate share based upon their common Class A and Class B stock in said corporation. The proportionate responsibility of each stockholder of said corporation for any defaulted loan made or to be made by a Stockholder to said corporation is as follows: Edythe M. Winslow
33 1/3%
Evelyne L. Coppell
33 1/3%
Jack Schlosser
11 1/9%
Leonard Zahn
11 1/9%
David Igelheimer
11 1/9%
Each of the undersigned of this Guaranty does hereby guarantee payment as above set forth and waives presentment, demand, notice of payment, protest and notice of protest and consents to and waives notice of every renewal or extension of time for payment. IN WITNESS *152 WHEREOF, the undersigned have hereunto set their hands, individually and as sole stockholders of said CABRAL MFG. CO. This agreement was signed by the five individuals whose names are listed therein as stockholders. On July 7, 1960, L. & S. Zahn & Co., Inc., loaned $45,000 to Cabral in return for which Cabral issued its promissory note to L. & S. Zahn & Co., Inc., due November 7, 1960, in the amount of $45,000 plus interest at 6 percent per annum. L. & S. Zahn & Co., Inc., is a corporation controlled by Samuel Zahn (Leonard's father) and Leonard Zahn. On August 3, 1960, L. & S. Zahn & Co., Inc., loaned an additional $5,000 to Cabral in return for which Cabral issued its promissory note to L. & S. Zahn & Co., Inc., due November 3, 1960, in the amount of $5,000 plus interest at 6 percent per annum. Cabral was unable to pay the $50,000 owed to L. & S. Zahn & Co., Inc., on the due dates in November of 1960. On February 14, 1961, the due dates of the loans made to Cabral by L. & S. Zahn & Co., Inc., on July 7, 1960, and August 3, 1960 were extended for 9 months or until November 14, 1961. Cabral issued a new promissory note due on November 14, 1961, in the amount of $50,000 with *153 interest at 6 percent per annum. Cabral was unable to pay the $50,000 owed to L. & S. Zahn & Co., Inc., on the due date of November 14, 1961, and the loan was extended to August 14, 1962. The notes given by Cabral to L. & S. Zahn & Co., Inc., were executed in New York City, New York, and were negotiable promissory notes. On August 16, 1960, the 1234 Employees Savings and Retirement Plan loaned Cabral $25,000 in return for which Cabral issued to the Plan its promissory note, due February 21, 1961, in the amount of $25,000 plus interest at 15 percent per annum. This note was endorsed and guaranteed by petitioner, Zahn, Igelheimer, Frederick Coppell, and Samuel Winslow. Cabral was unable to pay the $25,000 owing to the 1234 Employees Savings and Retirement Plan. The Plan pressed for collection and threatened to institute proceedings. An agreement was reached whereby the Plan would extend the loan for another 9 months with a provision that would enable it to call the note at any time after March 31, 1961, upon 2 months notice. Thereafter, on or about March 1, 1961, the due date of the loan to Cabral from the 1234 Employees Savings and Retirement Plan was extended to November 16, 1961. *154 A new note for $25,000 due November 16, 1961, plus interest at 15 percent per annum was issued by Cabral and endorsed and guaranteed by the same persons who endorsed the original note. The new note contained the call provisions which the prior note had contained. Cabral was unable to pay the $25,000 loan to the 1234 Employees Savings and Retirement Plan on the due date, November 16, 1961. Again, the Plan pressed for collection and threatened collection proceedings unless payment was made. An agreement was reached whereby the loan would be extended for an additional 3 months or until February 16, 1962. On November 16, 1961, a new note was issued for $25,000, plus interest at 15 percent per annum due February 16, 1962. The note contained a provision whereby it could be prepaid at any time after December 31, 1961. This note was endorsed and guaranteed by Samuel Winslow, Igelheimer, Zahn and petitioner. Cabral's notes to 1234 Employees Savings and Retirement Plan were executed and endorsed in New York City, New York and were negotiable promissory notes. Throughout the year 1961 Cabral made all monthly payments of interest due to L. & S. Zahn & Co., Inc., and to the 1234 Employees *155 Savings and Retirement Plan. Early in December 1961 one of Cabral's suppliers notified petitioner that Cabral had been the subject of a Dun & Bradstreet investigation which revealed that Cabral was slow in paying debts. The supplier also informed petitioner that the same report listed petitioner as a director of Cabral. The Dun & Bradstreet report was based upon erroneous information which had been supplied by Cabral's management in that the statement erroneously listed the capital stock of Cabral at $115,000 when in fact such stock was $51,000. The report also made no mention of the $85,000 in loans outstanding from Cabral. Cabral's management had given this information to Dun & Bradstreet in an effort to continue the company's credit position and without the knowledge of petitioner, Zahn, or Igelheimer. On December 9, 1961, petitioner, Zahn, and Igelheimer addressed a letter to Cabral in care of Samuel Winslow which read as follows: Two or three days ago we received a copy of Dun & Bradstreet Report of Cabral Mfg. Co. Inc. This is the first knowledge by any of the undersigned that such a Report existed. We protest the fact that such a Report was given, and that the same was *156 done without consulting or notifying us, and without the authority of the Board of Directors. We disassociate ourselves completely from the said Report and from any and all of the statements therein contained. We enclose herewith the resignation of each of us as a member of the Board of Directors of said company. On or about December 19, 1961, in New York City, New York, petitioner, Zahn, and Igelheimer executed the following agreement: AGREEMENT made this 19th day of December 1961 by and between JACK SCHLOSSER, hereinafter referred to as "SCHLOSSER", LEONARD ZAHN, hereinafter referred to as "ZAHN", and DAVID IGELHEIMER, hereinafter referred to as "IGELHEIMER", all residing in the County of Nassau, State of New York. WITNESSETH: WHEREAS, each of the parties hereto is the holder and owner of one-ninth of the issued and outstanding capital stock of CABRAL MFG. CO. INC., a Rhode Island corporation, hereinafter referred to as the "CORPORATION", and WHEREAS, ZAHN did cause L. & S. ZAHN CO. INC. to loan to the CORPORATION on his behalf, the sum of Fifty thousand ($50,000.) Dollars, as evidenced by a promissory note, dated November 14, 1961, made by CABRAL MFG. COMPANY to L. *157 & S. ZAHN CO. INC., being a renewal of a prior note to notes (which note and prior notes are hereinafter collectively referred to as the "FIRST NOTE"), the payment of which promissory note was guaranteed and endorsed by all of the parties hereto and others, and WHEREAS, the CORPORATION did borrow from the TRUSTEES OF THE 1234 EMPLOYEES SAVINGS AND RETIREMENT PLAN the sum of Twenty-five thousand ($25,000.) Dollars, as evidenced by a promissory note in that amount, dated February 16, 1961, made by CABRAL MFG. CO. INC. to the TRUSTEES OF THE 1234 EMPLOYEES SAVINGS AND RETIREMENT PLAN, being a renewal of a prior note or notes (which note and prior notes are hereinafter collectively referred to as the "SECOND NOTE"), which promissory note was endorsed and all of the parties hereto and others, and WHEREAS, it has been agreed among all of the parties hereto that SCHLOSSER will pay unto ZAHN and IGELHEIMER the sum of Twenty-five thousand ($25,000.) Dollars, upon all the terms and conditions hereinafter contained, NOW, THEREFORE, in consideration of the promises herein contained, and of the sum of One ($1.00) Dollar, and other good and valuable consideration, by each of the parties to *158 the others in hand duly paid, the receipt whereof is hereby acknowledged, it is agreed as follows: 1. SCHLOSSER will pay to ZAHN and IGELHEIMER the sum of Twenty-five thousand ($25,000.) Dollars, by check to the order of L. J. AND G. A. SHAPIRO, attorneys for ZAHN and IGELHEIMER. 2. SCHLOSSER does hereby transfer, set-over and assign unto ZAHN and IGELHEIMER any and all claims now existing, or which might exist in the future, in his favor, against the CORPORATION and against any other person or persons, arising out of the FIRST NOTE, the SECOND NOTE, and any extensions or renewals thereof, this assignment to take effect upon payment by SCHLOSSER to ZAHN and IGELHEIMER of the sum of $25,000, as above provided. 3. In consideration of the foregoing, ZAHN and IGELHEIMER do hereby release and discharge SCHLOSSER from any and all liability or obligation, now existing or which might exist in the future, in favor of ZAHN and IGELHEIMER, or either of them, under and by virtue of any and all guarantees and/or endorsements by SCHLOSSER of the FIRST NOTE, the SECOND NOTE, and any extensions or renewals thereof. 4. ZAHN and IGELHEIMER do hereby agree to indemnify SCHLOSSER and to hold him *159 free and harmless of and from any action, suit, or proceeding which may at any time be brought against SCHLOSSER arising out of the FIRST NOTE and/or the SECOND NOTE, or any extensions or renewals thereof, or out of any other matter relating to the CORPORATION. 5. SCHLOSSER does hereby release and discharge ZAHN and IGELHEIMER from any and all liability or obligation in his favor against them or either of them, and ZAHN and IGELHEIMER do hereby release and discharge SCHLOSSER of and from any and all liability or obligation in their favor or in favor of either of them, arising out of any matter whatsoever relating to the CORPORATION. 6. In the event that any claim is asserted against SCHLOSSER, or any suit, action or proceeding is commenced against him, arising out of the FIRST NOTE, the SECOND NOTE, or any renewal or extension thereof, or out of any other matter relating to the CORPORATION, SCHLOSSER shall, within five (5) days after notice thereof to him, give notice thereof by United States registered or certified mail to ZAHN and IGELHEIMER, and thereupon ZAHN and IGELHEIMER do hereby agree to defend such suit, action or proceeding on behalf of SCHLOSSER, at their own cost and *160 expense, and ZAHN and IGELHEIMER agree to idemnify SCHLOSSER and to hold him free and harmless from any and all damages, costs, attorneys fees, or expenses, arising out of such action, suit or proceeding. SCHLOSSER agrees to fully co-operate with said ZAHN and IGELHEIMER in any such suit, action or proceeding. 7. This agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs and assigns. 8. This agreement may not be changed orally. IN WITNESS WHEREOF the parties hereto have hereunto set their respective hands and seals the day and year first above written. /s/ Jack Schlosser L.S. Jack Schlosser /s/ Leonard Zahn L.S. Leonard Zahn /s/ David Igelheimer L.S. David Igelheimer On or about December 19, 1961, petitioner gave his check for $25,000 payable to Zahn's and Igelheimer's attorneys, who, thereafter, on or about December 31, 1961, mailed their check in the amount of $25,000 to the 1234 Employees Savings and Retirement Plan with a letter saying: "We are mailing you our check for $25,000 on behalf of Leonard Zahn and David Igelheimer in full payment of a promissory note in that amount made out to you by Cabral Manufacturing Co." During *161 1962 Zahn and Igelheimer received $5,000 from Cabral in connection with the $25,000 paid on Cabral's behalf to the 1234 Employees Savings and Retirement Fund. On September 18, 1963, Edythe Winslow, as creditor, instituted a creditor's proceeding under the laws of the State of Rhode Island against Cabral in the Supreme Court of Providence County to recover the balance of $9,926.25 on the loan she made to Cabral in 1959. At that time a temporary receiver was appointed. Cabral was insolvent at the time. On September 30, 1963, a permanent receiver was appointed for the purpose of winding up the affairs of Cabral and dissolving the corporation. On September 3, 1964, a final decree was entered dissolving the corporation. No distributions were made to creditors except to the State of Rhode Island and to the United States for taxes. L. & S. Zahn & Co., Inc., filed a claim against Cabral in the creditor's proceeding for $50,000 plus unpaid interest. No payment was made to L. & S. Zahn Co., Inc., by Cabral or the Court appointed receiver with respect to the claim filed against Cabral by L. & S. Zahn & Co., Inc. In October 1964 Evelyne L. Coppell and Frederick K. Coppell agreed to pay $2,000 *162 and Edythe Winslow to pay $1,600 and Igelheimer to pay $12,000 to L. & S. Zahn & Co., Inc., in respect of any liability they may have had under their guarantee of the loans made to Cabral that are involved herein. Igelheimer and Zahn personally filed a claim for $20,000 against Cabral in the creditor's proceeding in respect to the $25,000 paid on Cabral's behalf to the 1234 Employees Savings and Retirement Plan in payment of Cabral's debt to the Plan. No payment was made by Cabral or the court appointed receiver with respect to this claim. Igelheimer and Zahn took no deduction on their income tax returns with respect to the nonpayment of this claim. In January 1961 petitioner was notified by Frederick Coppell and Edythe Coppell that in their opinion the guaranty agreement did not cover the loans made by the L. & S. Zahn & Co., Inc., since the agreement related only to loans from stockholders. At the time of such guaranties petitioner was familiar with Cabral's operation and it was his belief and understanding that Cabral needed the funds that would be made available to it by the loans. He also believed that Cabral intended to, and in fact Cabral did, use the proceeds of the loans *163 in its business. In 1958 petitioner had an attack of angina pectoris. This condition did not have a debilitating effect on petitioner, and he recovered from the attack prior to 1961 and continued to come to the office each day and attend to his regular affairs of business. Petitioner retained his stock interest in Cabral, continuing his ownership of 100 shares of Class B common stock, and at no time disposed of these shares. On his 1962 income tax return, petitioner claimed a long-term capital loss of $6,000 on account of the worthlessness of his Cabral stock. Zahn and Igelheimer claimed long-term capital losses of $6,000 each on their 1961 income tax returns on account of the worthlessness of their Cabral stock. Respondent disallowed the deductions claimed by Zahn and Igelheimer on the ground that their Cabral stock became worthless in a year subsequent to 1961. On his income tax return for 1961 petitioner deducted $25,000 as an ordinary loss sustained in that year by reason of payment for the release from his guarantee and endorsement of the promissory notes issued by Cabral in respect of the loans referred to in his agreement with Zahn and Igelheimer and for the indemnity *164 agreement in respect to any matter relating to Cabral contained in that same agreement. Respondent in his notice of deficiency disallowed the deduction of $25,000 claimed by petitioner but allowed the amount as a short-term capital loss, thus decreasing the capital gains reported by petitioner by $15,136.71 with the following explanation: Your claimed deduction of $25,000.00 with respect to a loss sustained upon the payment for a release of liability arising under a guaranty of a loan obtained by Cabral Manufacturing Company has been disallowed inasmuch as you have not established the same as allowable as an ordinary deduction under any of the sections of the Internal Revenue Code. The payment for release of guaranty in the amount of $25,000.00 which is allowable as a short-term capital loss under Section 166(d)(1)(B) of the Internal Revenue Code results in a decrease of net capital gains of $15,136.71 when offset against capital gains reported. Petitioner takes the position that the $25,000 he paid to Zahn and Igelheimer in 1961 through their attorneys is an ordinary loss under the decisions in J. J. Shea, 36 T.C. 577 (1961), affd. 327 F. 2d 1002 *165 (C.A. 5, 1961); Eugene H. Rietzke, 40 T.C. 443 (1963); and D. J. Condit, 40 T.C. 24 (1963), affd. 333 F. 2d 585 (C.A. 10, 1964). J. J. Shea, supra, involved a loss incurred by a taxpayer who paid to be released from his personal guaranty of corporate obligations. If we view petitioner's payment here as payment for a release from his personal guaranty of Cabral's obligations, as petitioner argues we should, then this case is indistinguishable from J. J. Shea, supra, and is not distinguishable in principle from Eugene H. Rietzke, supra, and D. J. Condit, supra.
Respondent's first argument, though not stated in precisely such terms, is in effect a contention that our decisions in J. J. Shea, supra; Eugene H. Rietzke, supra; and D. J. Condit, supra, are legally incorrect. Respondent states that the origin of the $25,000 payment here involved was a capital transaction arising out of petitioner's purchase of stock in Cabral and later becoming a guarantor on an indebtedness of Cabral to enhance his investment in that stock. Respondent concludes that under *166 the rationale of Arrowsmith v. Commissioner, 344 U.S. 6 (1952), and cases following the doctrine there enunciated, the loss sustained by petitioner through the payment of the $25,000 is deductible only as a capital loss. It is respondent's position that these cases require that the nature of the expenditure be determined from the origin of the expenses, which respondent says in the instant case was petitioner's investment in Cabral's stock. This position is not supported by J. J. Shea, supra. The facts in that case show that the taxpayer there had invested in corporate stock and thereafter had joined in with other stockholders of that corporation in signing an agreement with the bank, guaranteeing installment paper of the corporation financed through the bank. It was to be released by the other stockholders from this guaranty that the taxpayer in J. J. Shea, supra, made the payment to certain other of the corporate stockholders who assumed his liabilities under his guaranty to the bank. The guaranty was made by the taxpayer in J. J. Shea, supra, in the belief that the corporation's use of the funds provided by the guaranty would *167 enhance the value of his stock in that corporation as well as produce profits for him in dividends. A similar belief led petitioner in this case to guarantee Cabral's obligations. It is apparent, therefore, that to the same extent that the origin of the $25,000 payment made by petitioner in the instant case was his ownership of stock in Cabral, the origin of the payment by the taxpayer in J. J. Shea was his ownership of his corporate stock. The argument made by respondent here is similar to his contentions which we rejected in our holding in J. J. Shea, supra. In both Eugene H. Rietzke, supra, and D. J. Condit, supra, the taxpayers owned stock of the corporations, the obligations of which they guaranteed and because of or to be relieved of such guarantee, made the payments held to be deductible losses in transactions entered into for profit. In Eugene H. Rietzke, supra, we held that payments made in settlement of that taxpayer's guaranty of the corporate indebtedness resulted in his acquiring no right of subrogation because the debt was not paid in full. We held that the amount paid was deductible under section 165(c)(2) of the Internal Revenue Code *168 of 1954 as a loss. In D. J. Condit, supra, it was a payment made by one stockholder to another that we held to be deductible as a loss in a transaction entered into for profit since that corporation did not become indebted to that taxpayer by subrogation. Respondent's second argument is that even though the agreement entered into by petitioner with Zahn and Igelheimer in form released petitioner from his obligations as guarantor on the indebtedness of Cabral and indemnified him from any loss arising out of any matter relating to Cabral, in substance it was merely a payment by petitioner of Cabral's indebtedness in accordance with and under the requirement of his guaranty of such indebtedness. Respondent states that what petitioner did was merely to arrange the form of his payment of his guaranty in such a way as to prevent his acquiring rights of subrogation in order to obtain a tax benefit by being able to deduct in full his $25,000 payment. Respondent cites Gregory v. Helvering, 293 U.S. 465 (1935), and Gilbert v. Commissioner, 248 F. 2d 399, 406 (C.A. 2, 1957), remanding for further findings a Memorandum Opinion of this Court, for the proposition *169 that the form of a transaction is not controlling when the transaction is lacking in substance either because it is a sham or is of a character that does not accord with substantial economic reality. The cases upon which respondent relies and numerous other cases hold that the form of a transaction will be ignored for Federal income tax purposes if such transaction is a sham or totally lacking in economic substance. Therefore, if petitioner's payment was in substance either a loan to Cabral or a payment by petitioner as a guarantor of Cabral's indebtedness whereby Cabral's obligations to its creditors became by subrogation an obligation to him, respondent's determination should be sustained. Whipple v. Commissioner, 373 U.S. 193 (1963), and Putnam v. Commissioner, 352 U.S. 82 (1956). However, we do not agree with respondent that in the instant case there was no economic substance to the agreement entered into by petitioner, Zahn, and Igelheimer under which the $25,000 here in issue was paid. Petitioner parted absolutely with $25,000 at a time when a $25,000 indebtedness on which he was one of four guarantors lacked over 2 months of being due under an extension *170 agreement and some doubt existed whether the agreement which petitioner and the four other stockholders of Cabral signed did in fact cover the $50,000 loan by L. & S. Zahn & Co., Inc., to Cabral. Even if petitioner were liable as the guarantor on the entire $75,000 of loans, there still remained a probability that petitioner's portion of the entire guaranty would be less than $25,000. Furthermore, while the corporation had suffered consistent losses, its sales were high, it was an operating business, it was not in default on the interest on its indebtednesses and had been able to extend the due date of the principal on the $25,000 and $50,000 indebtedness to February 16, 1962, and August 14, 1962, respectively. As of December 19, 1961, Cabral was not in such financial straits that it would be unreasonable to conclude that it would be able to discharge its own indebtedness. In December 1961 petitioner had just discovered that the managers of Cabral had given certain misinformation to Dun & Bradstreet. Since petitioner was a director of Cabral, he could reasonably conclude that because of this misinformation, he might be held liable to persons who extended general credit to Cabral. *171 After the signing of the agreement on December 19, 1961, for which petitioner paid the $25,000 he was idemnified against any potential liability to general creditors of Cabral as well as relieved of his guaranty of specific debts of Cabral. However, he retained no right to be reimbursed any part of the $25,000 even if Cabral became prosperous and paid all its own obligations. Under the facts here present there did exist economic substance to petitioner's agreement and it was not, as respondent contends, a mere arrangement by petitioner to release his subrogation rights for the purpose of acquiring a tax advantage without otherwise changing the character of his relationship to Cabral. Since we do not sustain respondent's contention that petitioner's agreement of December 19, 1961, with Zahn and Igelheimer was a mere sham lacking in economic reality, we conclude that petitioner in this case did not sustain a loss by paying a debt of Cabral on which he was a guarantor and thereby stepping into that creditor's shoes as so to be entitled only to a deduction for a worthless debt in accordance with Putnam v. Commissioner, supra. The facts here bring this case squarely under *172 our decision in J. J. Shea, supra, and within the rationale of our decisions in Eugene H. Rietzke, supra, and D. J. Condit, supra. Here as in those cases, in an effort to make a profit from corporate dividends and enhance the value of corporate stock, petitioner took certain actions and to be relieved from the possible consequence thereof paid the $25,000 here in issue. We therefore hold that petitioner is entitled to deduct the $25,000 as a loss from a transaction entered into for profit under section 165(a) and (c)(2) of the Internal Revenue Code of 1954. Since other adjustments were made in the notice of deficiency, Decision will be entered under Rule 50.