J. J. SHEA AND NINA L. SHEA, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79886.   Filed June 29, 1961.

*Vester T. Hughes, Jr. Esq.*, for the petitioners.
*Graham R. E. Koch, Esq.*, for the respondent.

WITHEY, *Judge:* Deficiencies have been determined in the income tax of petitioners for the calendar years 1954 and 1955 in the respective amounts of $11,224.42 and $1,060.26 and additions to tax under sections 294(d)(1)(B) and 294(d)(2) of the Internal Revenue Code of 1939 for 1954 in the respective amounts of $67.50 and $253.47.

The issues for decision are (1) whether respondent has erred in treating as a capital loss a loss deduction taken by petitioners as an ordinary loss, and (2) whether attorney fees paid by petitioners in 1955 were properly deducted as an ordinary loss. Other issues raised by the pleadings have been disposed of by agreement.

FINDINGS OF FACT.

Facts which have been stipulated are found accordingly.

Petitioners are husband and wife residing in Dallas, Texas, who filed their joint income tax returns for the calendar years 1954 and 1955 with the district director of internal revenue at Dallas. Petitioner or Shea as hereinafter used has reference to the husband.

The petitioner went to Dallas, Texas, in 1944 and in June of that year organized Lone Star Wholesalers, Inc., a Texas corporation, which since its organization has conducted a wholesale home appliance business in Dallas under franchise agreements with various manufacturers. He has been president of the corporation from its inception.

In 1953 Rupe, Inc., a Louisiana corporation, was formed and

acquired the capital stock of Interstate Electric Company and its subsidiary corporations, Auto-Lec Stores, Inc., Auto-Lec Stores of Louisiana, Inc., Auto-Lec Stores of Mississippi, Inc., and Auto-Lec Stores of Florida, Inc. Interstate Electric Company conducted a wholesale electrical supply and appliance business in New Orleans, Louisiana, and through its subsidiary corporations operated 33 retail outlet stores in Louisiana, Mississippi, Florida, and Georgia. Shortly after acquiring the stock of Interstate Electric Company and its subsidiary corporations, Rupe, Inc., changed its name to Interstate Distributors, Inc., but it will be referred to hereinafter by its original name.

At the time of the formation of Rupe, Inc., the petitioner was given the opportunity to and did purchase 10 percent of its capital stock and debentures for $100,000. Others acquiring the remainder of the stock and debentures and the percentage acquired by each were, Dallas Rupe & Son, a corporation engaged in the investment banking business in Dallas, 27½ percent, General Insurance Corporation, Fort Worth, Texas, 27½ percent, Reserve Life Insurance Company, Dallas, Texas, 25 percent, and Walter H. Weil, Jr., 10 percent. The petitioner borrowed the $100,000, which he paid for the stock and debentures, giving therefor two promissory notes secured by the stock and debentures. At the time the petitioner purchased the stock and debentures there was no requirement that he sign any guaranty agreement and no such agreement had been discussed with him. However, at the time the petitioner purchased the stock and debentures, Dallas Rupe & Son, General Insurance Corporation, and Reserve Life Insurance Company entered into an agreement with petitioner to purchase his stock and debentures at the price he paid therefor any time he requested them to do so.

The development and operation of the various Auto-Lec Stores and Interstate Electric Company, the subsidiary corporations of Rupe, Inc., and the paper generated by the sale of appliances on the installment plan resulted in further bank credit being required for the overall business. To provide the required credit the stockholders of Rupe, Inc., on November 30, 1953, signed an agreement with the National Bank of Commerce of New Orleans, Louisiana, jointly and severally guaranteeing installment paper to be financed through that bank in the amount of $1,666,666. The petitioner's liability was limited to 10 percent of the foregoing amount, or $166,666.60, assuming his coguarantors were solvent and could pay their share if called upon to do so. At the time the petitioner entered into the guaranty he had reason to believe that the corporations' use of the funds provided by the guaranty would enhance the value of his stock in Rupe, Inc.

The installment paper thereafter acquired by National Bank under the guaranty agreement was secured by chattel mortgages on home appliances sold, and in most instances of delinquencies, merchandise was repossessed and resold. Delinquent paper was replaced by depositing current paper and the necessity of redeeming delinquent paper with cash was avoided.

By the latter part of 1954 the growth and expansion of the business had exhausted the available supply of capital and National Bank was holding installment paper to the extent of the amount contemplated by the guaranty agreement. As a consequence the bank requested additional collateral as a requirement for purchasing installment paper in an amount in excess of that covered by the guaranty. Late in 1954 the stockholders of Rupe, Inc., held a meeting to consider the request of National Bank. Because of his liability on the guaranty of November 30, 1953, and of his desire to be relieved of that liability and being fearful that any new liability he might incur would impair his personal credit with respect to borrowings by Lone Star Wholesalers, Inc., of which he was president, the petitioner declined to participate in providing funds or credit to meet National Bank's request for additional collateral. The petitioner then sought a release by the other stockholders of Rupe, Inc., from his liability under the guaranty but they were not agreeable to that. As a consequence the petitioner informed Dallas Rupe & Son, Reserve Life Insurance Company, and General Insurance Corporation that he desired to withdraw from Rupe, Inc., and requested them to purchase his stock and debentures for $100,000 as they had agreed to do at the time he purchased them. They informed him that they would purchase the stock and debentures as they had agreed but that this would not relieve him of his liability under the guaranty. Dallas Rupe & Son and Weil also declined to furnish any funds to provide the additional collateral requested by the bank. Dallas Rupe & Son then proposed that since it, Weil, and petitioner were unwilling to furnish any additional funds, they should surrender their stock and debentures in Rupe, Inc., to the other two stock and debenture holders, Reserve Life Insurance Company and General Insurance Corporation, surrender to those two companies the rights to participate in Rupe, Inc., and retire from that corporation; that the two insurance companies should assume all of the burdens of operations of Rupe, Inc., and its subsidiary corporations and assume the liability of Dallas Rupe & Son, Weil, and petitioner on the guaranty; and that the two insurance companies thereupon should become entitled to all of the profits of Rupe, Inc., and its subsidiary corporations. Shea left the meeting at that time but later in the meeting the two insurance companies accepted the proposal of Dallas Rupe & Son to the extent that it involved Dallas Rupe & Son and Weil.

Subsequently Dallas Rupe & Son and Weil surrendered their stock and debentures in Rupe, Inc., to the insurance companies. Dallas Rupe & Son also paid to the insurance companies its proportional part of $100,000, the amount at which it and the insurance companies had agreed to purchase the petitioner's stock and debentures in Rupe, Inc., and surrendered to the insurance companies its right to acquire any of the stock and dentures.

In December 1954, the petitioner effected an agreement with the insurance companies under which he transferred his stock and debentures in Rupe, Inc., and obtained a discharge of his $100,000 liability on the two notes he had executed to obtain the money to pay for the stock and debentures. In addition, in consideration for the payment of cash to and the transfer of other property to the insurance companies and the payment of certain expenses relating to the guaranty, all totaling $26,815.83, the insurance companies assumed the petitioner's liability under his guaranty to National Bank. At the time the foregoing agreement was effected the petitioner had neither paid nor been called upon to pay any amount under his guaranty to National Bank. Neither at that time nor at any prior time was Rupe, Inc., or any of its subsidiary corporations insolvent or in immediate danger of insolvency.

In their income tax return for 1954 the petitioners deducted $34,682.41 as an ordinary loss sustained in that year by reason of petitioner's payments to be released from his guaranty to National Bank. In their return for 1955 the petitioners deducted $1,250 as an ordinary loss sustained in that year by reason of the petitioner's payment of an attorney's fee incurred in connection with the petitioner's release from his guaranty to National Bank. In determining the deficiency for 1954 the respondent determined that the petitioner sustained a loss of only $26,815.83, that the loss was a short-term capital loss, that only $1,000 thereof was deductible for 1954 and that the remainder was to be carried over to the 5 succeeding years. Likewise in determining the deficiency for 1955 the respondent determined that the deduction taken represented a short-term capital loss of which only $1,000 was deductible for 1955 and that the remainder was to be carried over to the 5 succeeding years.

OPINION.

Taking the view that the petitioner's guaranty to National Bank is to be equated with his purchase of stock and debentures in Rupe, Inc., for $100,000 and taking the view that the petitioner's transfer of the stock and debentures to the insurance companies, his payments of $26,815.83 and his release from the guaranty constituted an indivisible transaction, the respondent contends that the petitioner in effect sold the stock and debentures for $73,184.17 ($100,000 less payments of

$26,815.83) and thereby sustained a capital loss of $26,815.83 which was deductible as a short-term capital loss as determined by him. The petitioners content that as a result of petitioner's payments of $26,-815.83 to be released from his guaranty he sustained an ordinary loss in that amount which is deductible under section 165(c)(2) of the Code of 1954 which provides for the deduction by an individual of losses incurred in any transaction entered into for profit, though not connected with a trade or business.

The record is clear that at the time the petitioner purchased the stock and debentures, Dallas Rupe & Son and the insurance companies agreed to purchase them from him at the price he paid for them, $100,000, at any time he requested those parties to do so. The record is also clear that those parties at all times thereafter were ready and willing to carry out their agreement and in the end did so. The petitioner desired to be released from his guaranty but those parties were not obligated to do that. Dallas Rupe & Son declined to do so. At first the insurance companies declined to do so but eventually did so at a price which petitioner was willing to and did pay. We are unable to find from the record that the petitioner's ability to dispose of his stock and debentures was in anywise dependent upon his entering into an agreement with the insurance companies to release him from his guaranty. That the petitioner's disposition of his stock and debentures and his making of the payments for the release of the guaranty were not indivisible, is we think recognized by the parties in the stipulation of fact filed herein in which they have stipulated that the "amount of the loss suffered by Shea by reason of his payments to be released from his guaranty was $26,815.83." As we understand the foregoing statement the parties in effect have stipulated that the controverted loss was incurred by petitioner by reason of his paying $26,815.83 for his release from the guaranty. The remainder of the record sustains that view of the stipulated statement.

Under the provisions of section 1222(2) and (4) of the Code of 1954 a short-term capital loss as well as a long-term capital loss arises only "from the sale or exchange of a capital asset." Section 1221 of the Code defines the term "capital asset." However, the respondent points us to nothing in that section and we find nothing to indicate that a taxpayer's liability under a guaranty ranging from a minimum of $166,666 to a maximum of 10 times that amount as was the situation here constitutes a capital asset in his hands. Nor does the respondent point us to any ruling or decision nor do we know of any which warrants the conclusion that a loss sustained by a taxpayer as a result of a payment by him to be released from his guaranty is a loss from the sale or exchange of a capital asset by the taxpayer. The respondent's contention is not sustained.

In *Marjorie Fleming Lloyd-Smith*, 40 B.T.A. 214, 223 (1939), affirmed on another point 116 F. 2d 642 (C.A. 2, 1941), certiorari denied 313 U.S. 588 (1941), a loss resulting from payments made by a guarantor to effect an adjustment or compromise of the amount of her liability under a guaranty of bonds of a corporation, stock of which she was a beneficial owner, where the guarantor had reason to believe that the corporation's use of funds provided by the guaranty would enhance the value of the stock of the corporation and where the payments were made for the sole purpose of reducing the amount of her liability under the guaranty, was held to be deductible as a loss incurred in a "transaction entered into for profit" within the meaning of section 23(e)(2) of the Revenue Act of 1932, the provisions of which were substantially identical with those of section 165(c)(2) of the Code of 1954 relied on by petitioners. In *Peter Stamos*, 22 T.C. 885 (1954), the taxpayer, a stockholder in a corporation, guaranteed the payment of certain obligations of the corporation. Legal expenses incurred by him for the sole purpose of settling his liability as guarantor were held to be deductible as a loss incurred in a transaction entered into for profit within the meaning of section 23(e)(2) of the Code of 1939, on authority of *Marjorie Fleming Lloyd-Smith*, *supra*.

When the petitioner entered into the guaranty here involved, the business of the subsidiaries of Rupe, Inc., was being developed and expanded, and in entering into the guaranty the petitioner had reason to believe that the corporations' use of the funds provided by the guaranty would enhance the value of his stock in Rupe, Inc. It is true that in *Marjorie Fleming Lloyd-Smith*, *supra*, and *Peter Stamos*, *supra*, the corporations there involved were insolvent at the time that the payments there in question were made, whereas here the corporations for the benefit of which the petitioner's guaranty was given were not insolvent when petitioner made the payments in question. However, we do not deem that difference to be of importance in view of the agreement of the parties that the payments here involved resulted in a loss to the petitioner and in view of the fact that the payments controverted here and for which deduction is sought were made by petitioner solely for relief from his guaranty. Since the petitioner in effect disposed of his stock for the same amount that he paid for it, it is apparent that the controverted payments made by petitioner to the insurance companies to be relieved of his guaranty did not enhance the value of the stock in his hands or in the hands of the insurance companies.

In view of what has been said above we are of the opinion that the holdings in *Marjorie Fleming Lloyd-Smith*, *supra*, and *Peter Stamos*, *supra*, are applicable and controlling here and we accordingly hold that the controverted loss was incurred in a transaction entered into for profit within the meaning of section 165(c)(2) of the Code and was properly deductible in full as an ordinary loss for 1954. The contention of the petitioners is sustained.

Each of the parties has cited on brief *Putnam* v. *Commissioner*, 352 U.S. 82 (1956), and they are in agreement, and we think properly so, that that case is without application here. In the *Putnam* case the taxpayer as guarantor paid an indebtedness of a corporation and was unable to collect from the corporation which though still in existence was without any assets. In holding that the taxpayer's payment was deductible as a nonbusiness bad debt the Supreme Court said:

> The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt. * * *

In the instant case, as set out in our findings, the petitioner, at the time he made the payments totaling $26,815.83 and was released from his liability on his guaranty, had neither paid nor been called upon to pay any amount under his guaranty, nor at that time or at any prior time was Rupe, Inc., or any of its subsidiary corporations insolvent or in immediate danger of insolvency. The petitioner therefore under his guaranty had made no payment of any indebtedness of Rupe, Inc., or its subsidiary corporations which could give rise to any bad debt owing to him by them or any of them. Likewise we think *S. D. Ferguson*, 28 T.C. 432, affd. 253 F. 2d 403 (C.A. 4, 1958), is inapplicable here. There the taxpayer as endorser of a corporation's note paid the note but was unable to collect from the corporation because of its lack of assets. On authority of *Putnam* v. *Commissioner*, *supra*, the respondent's determination that the taxpayer's payment was deductible as a nonbusiness bad debt was sustained.

Since the parties have agreed that our holding as to the loss for 1954 is to be controlling as to the issue involving the deductibility of the attorney's fee paid by petitioner in 1955, we also hold for the petitioners on the latter issue.

Inasmuch as other adjustments are to be made pursuant to stipulation of the parties,

*Decision will be entered under Rule 50.*