MOZELLE RUSHING, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2550-70—2552-70, 2582-70, 2583-70, 3659-70, 3660-70.
Filed September 21, 1972.

*William Norton Baker*, for the petitioners.

*Harold L. Cook* and *John W. Dierker*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the income taxes of the petitioners, as follows:

| Docket No. | Petitioners | Taxable year ended | Amount |
|---|---|---|---|
| 2550-70 | Mozelle Rushing | 12/31/67 | $7,468.34 |
| 2551-70 | Double H Corp | 1/31/67 | 6,915.89 |
| | | 1/31/68 | 354.91 |
| 2552-70 | W. B. Rushing | 12/31/67 | 7,468.34 |
| 2582-70 | W. B. Rushing and Mozelle Rushing | 12/31/66 | 181,644.80 |
| 2583-70 | Lubbock Commercial Building, Inc | 1/31/67 | 3,129.40 |
| | | 1/31/68 | 13,046.91 |
| 3659-70 | Catherine Tidmore | 12/31/67 | 2,513.69 |
| 3660-70 | Max Tidmore | 12/31/67 | 2,513.69 |

[1] Cases of the following petitioners have been consolidated herewith: Double H Corporation, docket No. 2551-70; W. B. Rushing, docket No. 2552-70; W. B. Rushing and Mozelle Rushing, docket No. 2582-70; Lubbock Commercial Building, Inc., docket No. 2583-70; Catherine Tidmore, docket No. 3659-70; and Max Tidmore, docket No. 3660-70.

Numerous concessions having been made by the parties, the only issues left for decision involve the petitioners at docket Nos. 2550–70, 2552–70, 3659–70, and 3660–70.

The first question is whether the petitioners are entitled to interest expense deductions under section 163 [2] for amounts paid in connection with their guarantee of a corporate debt. The second issue presented is whether petitioners are entitled to deduct under section 162, 165, or 212 the legal and accounting expenses paid on behalf of Nova Corp.

### FINDINGS OF FACT

Some of the facts have been stipulated; they are so found and incorporated herein by this reference.

Petitioners W. B. Rushing (hereinafter referred to as Rushing), docket No. 2552–70, and Mozelle Rushing, docket No. 2550–70, are husband and wife and have resided in Lubbock, Tex., since before 1950. At the time the petitions were filed, they were residents of Lubbock. They filed separate community income tax returns for 1967 prepared on the cash basis of accounting with the district director of internal revenue, Dallas, Tex.

Petitioners Max Tidmore (hereinafter referred to as Tidmore), docket No. 3660–70, and Catherine Tidmore, docket No. 3659–70, are husband and wife and have resided at Lubbock, Tex., since before 1950. At the time the petitions were filed, they were residents of Lubbock. They filed separate community income tax returns for 1967 prepared on the cash basis of accounting with the district director of internal revenue, Dallas, Tex.

The use of the word "petitioners" hereinafter will refer collectively to Rushing and Tidmore, unless otherwise indicated.

Nova Corp. (hereinafter referred to as Nova or the corporation) was in the business of manufacturing a particular type of radio. Tidmore and Rushing were approached by Robert L. Cash regarding their possible acquisition of stock in Nova. Nova was in need of capital at the time, and this was the prime reason for offering petitioners an interest in Nova. Tidmore and Rushing acquired a portion of the corporation and helped provide the needed additional financing. They arranged a line of credit for Nova at the Citizens National Bank of Lubbock, Tex. (Citizens). The stock in Nova Corp. was acquired in January 1966 and Nova began borrowing from Citizens in July 1966. By 1967 Citizens had advanced over $300,000 to Nova. The procedure for these loans was generally the same. Money was advanced directly

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

to Nova or placed in the Nova account for use in Nova's business operations. Notes were then prepared by Citizens, and signed on the face on behalf of the corporation by Robert L. Cash and Ronald Boucher. These notes were then endorsed on the back by Tidmore. Rushing endorsed all but two of the notes. Nova could not have borrowed the sums advanced without the endorsements of the petitioners, and the petitioners acted as guarantors specifically to enhance the value of their interest in Nova.

Petitioners were involved in a further transaction wherein Nova acquired Hallmark, Inc. In order to finance this acquisition, Nova borrowed an additional $35,000 from the Mercantile National Bank, Dallas, Tex. (Mercantile). Rushing, at the time, guaranteed the notes for $35,000 and Tidmore, by a letter dated March 16, 1967, acknowledged his 50-percent liability on Rushing's guarantee.

Nova was adjudged a bankrupt in 1967 and was insolvent as of December 31, 1967. Rushing and Tidmore, pursuant to their guarantee agreements, were called upon to pay Nova's outstanding notes. Upon demand of Mercantile, petitioners on May 3, 1967, paid the corporation notes and interest. On June 8, 1967, petitioners paid Citizens in full for all of the unpaid notes and accrued interest of Nova.

In 1967 petitioners paid interest on the Nova notes, as follows:

| Docket No: | Petitioner | Amount |
|---|---|---|
| 2550–70 | Mozelle Rushing | $3,604.78 |
| 2552–70 | W. B. Rushing | 3,604.79 |
| 3659–70 | Catherine Tidmore | 6,776.49 |
| 3660–70 | Max Tidmore | 6,776.50 |

The petitioners on their 1967 income tax returns deducted the foregoing amounts as interest expenses. In addition, petitioners in docket Nos. 2550–70 and 2552–70 paid interest in the total amount of $440.42 to Mercantile which was not claimed and is not reflected in the foregoing figures. This amount is now claimed as a deduction.

In 1967 petitioners paid certain legal and accounting expenses. They paid the law firm of Evans, Pharr, Trout and Jones $1,505.76 ($376.44 in each docket) for services rendered regarding pending litigation by Tex-Tool Manufacturing Co., a Dallas corporation. Nova acquired a subsidiary known as Capco-Capacitators from Tex-Tool for cash and a $40,000 note. Petitioners, subsequent to and independent of their original promises of guarantee which accompanied their purchase of Nova's stock, agreed to further guarantee Nova's $40,000 note to Tex-Tool. The legal expenses were a result of Tex-Tool's threat to file suit against Nova, Capco-Capacitators, and petitioners on this outstanding obligation. This action was taken by Tex-Tool as the petitioners were attempting to close out Nova Corp. The petitioners were fully aware

of Nova's pending insolvency and they incurred these expenses specifically to reduce the amounts they would eventually be responsible for as guarantors of this outstanding obligation. In fact, through these negotiations some sort of extension was eventually worked out.

The petitioners expended further amounts when they paid an attorney and a C.P.A. firm "more or less an agent's fee" to negotiate the sale of certain of Nova's assets. The specific amounts expended were as follows:

Tidmore paid a fee of $100 to an attorney, Buddy Adams, for expenses Adams incurred while trying to dispose of Nova's assets during the process of liquidation.

Tidmore also hired a C.P.A. firm to aid in negotiations which eventually led to Nova's sale of Capco-Capacitators. The fee for this work amounted to $656.16.

The petitioners deducted all of the above legal and accounting fees as business expenses on their 1967 returns. Respondent, in his notices of deficiency increased petitioners' taxable income to reflect the disallowance of the interest deductions and the legal and accounting expenses.

## OPINION

Two issues are presented for our consideration.

The first is whether petitioners are entitled to a deduction under section 163(a)[3] for interest expenses paid in 1967 in connection with their guarantee on the Nova debt, or whether it is an additional cost to petitioners in the Nova stock.

It is clear that according to Texas State law, the petitioners were endorsers[4] on Nova's notes to Citizens. As to the Mercantile notes, a formal guarantee agreement existed. They were not cosigners of any of the notes and were, therefore, only secondarily liable on the notes of Nova.[5]

In the case of *Kate Baker Sherman*, 18 T.C. 746 (1952), this Court held at pages 753-754 that when the holder of a defaulted note liquidated the endorser's collateral and applied some of the proceeds to the

---

[3] SEC. 163. INTEREST.

    (a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

[4] Vernon's Texas Codes Annotated, sec. 3.402, states:

    "Unless the instrument clearly indicates that a signature is made in some other capacity, it is an indorsement. * * *"

    There is no evidence that petitioners' signatures herein were made in any capacity other than as endorsers.

[5] Vernon's Texas Codes Annotated, sec. 3.414, states:

    "(a) Unless the indorsement otherwise specifies * * * every indorser engages that upon dishonor and any necessary notice of dishonor and protest he will pay the instrument according to its tenor at the time of his indorsement * * *"

payment of interest due on the note, the endorser of such note was entitled to an interest deduction under section 23(b), I.R.C. 1939.

Subsequent to that case, the Supreme Court decided the case of *Putnam* v. *Commissioner*, 352 U.S. 82 (1956). The Court in *Putnam* held that upon payment by the guarantor of debt, the debtor's obligation to the creditor becomes an obligation to the guarantor and the guarantor is then entitled to a nonbusiness bad debt deduction due to the primary obligor's insolvency. The Court did not deal specifically with the deductibility of the interest portion of that bad debt. It did recognize, however, that the guarantor's obligation on the original debt is one of secondary liability only.

Relying on the scope of the *Putnam* rule, the Court of Appeals for the Fifth Circuit in the case of *Nelson* v. *Commissioner*, 281 F. 2d 1, 5 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court, again reviewed the issue raised in *Sherman* and specifically denied an interest deduction where payments for principal and interest were incurred by a guarantor on corporate obligations. The court in *Nelson* reasoned that a deduction for interest cannot be taken unless the interest was owed on an indebtedness of the taxpayer. The indebtedness upon which the interest arises in the guarantee situation is that of the primary obligor, not the guarantor, and the intention of the statute is to deny the deduction where the "liability is secondary or indirect," except in a specific circumstance set out in Regs. 118, section 39.23(b)-1 (presently section 1.163-1(b), Income Tax Regs.)

Respondent in the present case, relying on *Nelson*, correctly disallowed the interest deductions. We therefore uphold his determination as to this issue.

The second issue for consideration is the deductibility of the various legal and accounting expenses incurred while Nova was in the process of discontinuing its operations.

The petitioners claim that all of these expenses were incurred by them in their capacity as guarantors of Nova's notes. The respondent contends that these are corporate expenses and are not deductible by the petitioners. The respondent views the amounts expended by petitioners as capital contributions which must be added to their basis in Nova's stock.

Prior to the *Putnam* case, it was established in *Marjorie Fleming Lloyd-Smith*, 40 B.T.A. 214, 223 (1939), affd. 116 F. 2d 642 (C.A. 2, 1941), certiorari denied 313 U.S. 588 (1941), and *Peter Stamos*, 22 T.C. 885 (1954), that legal expenses incurred as a guarantor are deductible under section 165(c)(2).

"These expenditures occurred for the sole purpose of reducing her liability under the guaranty. As such, they are deductible as losses on a

transaction entered into for profit." *Marjorie Fleming Lloyd-Smith, supra* at 223. See also *Peter Stamos, supra* at 891.

There are many questions inherent in this second issue. First, we must determine whether any of the expenses are the type of expenses held deductible by *Lloyd-Smith* and *Stamos*. Next, we must determine whether the doctrine established by *Lloyd Smith* and *Stamos* retains its vitality in light of the *Putnam* case. Finally, we must determine whether the petitioners are the proper parties to claim the legal expenses in question.[6]

There is no doubt that the expenses relating to the attempted litigation by Tex-Tool are similar in nature to those held deductible under *Lloyd-Smith* and *Stamos*. However, the question remains whether the rationale of *Putnam* demands that all expenses incurred as a result of a taxpayer's status as a guarantor must now be treated as a capital loss under section 166, rather than losses incurred in a transaction entered into for profit. We do not think that *Putnam* demands such a result.

First, it should be noted that *Putnam* did not foreclose guarantor transactions from being transactions entered into for profit. See the concurring opinion in *Bert W. Martin*, 52 T.C. 140, 147 (1969), affirmed per curiam 424 F. 2d 1368 (C.A. 9, 1970), certiorari denied 400 U.S. 902 (1970). See also *Santa Anita Consolidated, Inc.*, 50 T.C. 536, 559 (1968).

It is still possible in many circumstances to consider payments resulting from guarantor transactions as payments made in a transaction entered into for profit. Indeed, in numerous post-*Putnam* cases, this Court has held that certain payments which had their genesis in petitioners' status as guarantors were payments which resulted in losses incurred in a transaction entered into for profit, deductible under section 165(c)(2). See, for example, *J. J. Shea*, 36 T.C. 577 (1961), affirmed per curiam 327 F. 2d 1002 (C.A. 5, 1964) ; and *Eugene H. Rietzke*, 40 T.C. 443 (1963). See also *Santa Anita Consolidated, Inc., supra* at 555, which involved a corporate guarantor and section 165(a).

In *Eugene H. Rietzke, supra*, a taxpayer undertook guarantor obligations subsequent to and independent of the acquisition of his

---

[6] Implicit in our analysis is the assumption that, with respect to these expenses, petitioners would have no claim for reimbursement giving rise to a bad debt, the deduction of which would be controlled by *Putnam* v. *Commissioner*, 352 U.S. 82 (1956). Neither party in the pleadings, at trial, or on brief has addressed himself to this question and it appears that under Texas law such a claim for reimbursement on the circumstances of this case would be questionable. See, for example, *Armstrong* v. *Anderson*, 91 S.W. 2d 775 (1936), reversed on other grounds, 120 S.W. 2d 444 (1938), 132 S.W. 2d 393 (1939) ; *American Security Co.* v. *Lehr*, 93 S.W. 681 (1906) ; and *J. J. Shea*, 36 T.C. 577, 583 (1961), affirmed per curiam 327 F. 2d 1002 (C.A. 5, 1964), a Texas case. Cf. *Bennett* v. *Dowling*, 22 Tex. 660 (1859).

original investment in a corporation. The corporation subsequently filed a voluntary petition in bankruptcy and payment was demanded of the taxpayer-guarantor. *After* this series of events, the taxpayer in his capacity as guarantor made payments in settlement of his obligations. We allowed the taxpayer to deduct these settlement payments under section 165(c)(2) as losses incurred in a transaction entered into for profit.

*J. J. Shea, supra,* is another post-*Putnam* Tax Court decision which the Fifth Circuit (to which an appeal in this case would lie) affirmed per curiam. In that case, an individual undertook guarantor obligations subsequent to and independent of the acquisition of his original investment. The petitioner made certain payments in order to be released from this guarantor liability and not only did we allow the petitioner to deduct these payments under section 165(c)(2) but, following *Lloyd-Smith* and *Stamos,* we also allowed a deduction under section 165(c)(2) for the legal expenses incurred in connection with this release from liability. The case at bar has much in common with both *Rietzke* and *Shea.*[7]

It is true that a guarantor liability undertaken as part and parcel of a stock acquisition is a transaction which is capital in nature, see *J. Meredith Siple,* 54 T.C. 1 (1970), and the legal expenses incurred as a result of such a transaction would most likely assume the character of the underlying transaction. See *Woodward* v. *Commissioner,* 397 U.S. 572 (1970), and *United States* v. *Gilmore,* 372 U.S. 39 (1963). However, we are not faced with such a transaction and for the purposes of this case need not consider the effect of such a situation on the doctrine established in *Lloyd-Smith* and *Stamos.* In the case at bar, it is an established fact that petitioners' guarantee of Nova's note to Tex-Tool was separate from and subsequent to the original acquisition of Nova's stock. Payments and expenses relating to such a guarantee can in no way be deemed a part of the costs of acquisition of Nova's stock. This Court stated in distinguishing both the *Shea* and *Rietzke* cases—

More importantly, the undertaking [assumption of guarantor liability] was given subsequent to, and independently of, the acquisition of the original investment by the taxpayer. Under such circumstances, it would have been difficult to hold that the payments were part of the *costs of acquisition* of that investment. * * *[*J. Meredith Siple, supra* at 9.]

The final question we must answer is whether the petitioners are the proper parties to claim this expense. Respondent contends that

---

[7] Furthermore, in the present case, petitioners' guarantor obligations which gave rise to the involved legal expenses had not evolved into a bad debt of any kind at the time the legal expenses were incurred. In fact, the result of the legal work done was to extend the time in which payment was to be made on this outstanding obligation.

the primary obligor on the note was Nova, not petitioners, therefore the legal expenses were deductible only by Nova.

As a general rule, for tax purposes, a corporation is an entity distinct from the stockholders. *Dalton* v. *Bowers*, 287 U.S. 404 (1932). Deductions are personal to the taxpayers and one taxpayer may not take deductions properly belonging to another. See *Deputy* v. *duPont*, 308 U.S. 488 (1940). However,

As in the case of most general rules, an exception to this one has been developed. In a number of cases, the courts have allowed deductions when the expenditures were made by a taxpayer to protect or promote his own business, even though the transaction giving rise to the expenditures originated with another person and would have been deductible by that person if payment had been made by him. * * *

*James L. Lohrke*, 48 T.C. 679, 684–685 (1967), and numerous cases therein.

The Court in *Lohrke*, after reviewing many decisions in the area, formulated the following standard to aid in a determination as to whether the exception is applicable.

The tests as established by all of these cases are that we must first ascertain the purposes or motive which cause the taxpayer to pay the obligations of the other person. Once we have identified that motive, we must then judge whether it is an ordinary and necessary expense of the individual's trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? * * * [48 T.C. at 688.]

The exception to the general rule as expressed in *Lohrke* has been applied to the legal expense area.

In *E. L. Potter*, 20 B.T.A. 252 (1930), the taxpayer was actively engaged in the hotel business. During the taxable year 1922 he was a shareholder in the Clarendon Hotel corporation while also serving as its president and manager. The corporation defaulted on its mortgage indebtedness and the mortgage holder instituted an action against the corporation to enforce his mortgage lien. A further result of the suit would have been to force the removal of the taxpayer from control. The taxpayer employed attorneys to resist the action and paid them from his own funds. He then sought to deduct these legal expenses. The issue, as framed by the Board of Tax Appeals, was—

whether an individual who is not named as a party defendant in an action, but who will be substantially affected by its result, may employ attorneys to defend it and protect his interests and deduct the expenditure as ordinary and necessary business expense. [*E. L. Potter, supra* at 254.]

The Board of Tax Appeals found that Potter was engaged in the business of financing and managing hotels as a regular vocation. It went on to state at page 255: "We think there was a necessity that the petitioner protect his interests, as his interests would be vitally

affected \* \* \*, and that he had a right to employ counsel and deduct the expenditure as a business expense."

In a later case, *H. William Ihrig*, 26 T.C. 73 (1956), the following situation arose: The petitioner, an officer-stockholder of two corporations, paid certain expenses to keep his corporations viable. Among these expenses was a $600 fee paid to an attorney for the lessor of the premises upon which the petitioner's corporation was located. The lessor's attorney had advised the lessor against dispossessing petitioner's corporation. The petitioner, claiming that a forced closing of the corporation would impose liabilities upon him as a stockholder and guarantor, attempted to deduct the expenses under section 23(a) (1)(A) (the predecessor of section 162) as expenses incurred by him in carrying on a trade or business. The Court distinguished between the business of the corporation and that of the petitioner. "While the payments would have been expenses of the corporations had they been paid by them, they were \* \* \* not the business expenses of petitioner."

We find *Ihrig* distinguishable. The Court in *Ihrig* found that the expenses were the type which the corporation would ordinarily incur in carrying on business and preserving its own corporate viability. What the paying of these expenses in fact accomplished was to "safeguard and maintain the existence of the corporations." In the present case, there was no attempt to maintain the viability of the corporation. The time for that had already passed. At the time these expenses were incurred, petitioners had only one purpose for expending these sums. That purpose was to directly reduce their guarantor liability.

It is true that in the present case the primary obligor on the debt was Nova. However, the real economic beneficiaries of the legal services rendered were the petitioners. The motive behind these expenses was not to aid an all but defunct corporation but rather to reduce the amount by which the guarantors would esentually be liable. By affecting Nova's obligation, petitioners were able to reduce the amounts due on their guarantees at their very source. The significant fact in the present case is that at the point in time at which these legal services were required it was a foregone conclusion that petitioners, not Nova, would bear the cost of Nova's impending insolvency. In *Lloyd-Smith* and *Stamos*, the expenses were incurred by taxpayers after their guarantee obligation had been accrued. However, we do not deem this distinction to be of importance in view of the fact that Nova's impending bankruptcy placed the petitioners in the position of defending Nova in form but in substance of defending their own assets which were surely to be depleted as a direct consequence of Nova's losses.

Under the limited circumstances of the present case, where there is an impending corporate bankruptcy accompanied by an inevitable

guarantor liability, the rationale of *Potter* and *Lohrke* is clearly more acceptable. There is no discernible reason for recognizing a section 162 business expense as an individual's when it is in form a corporate expense and in substance an individual's expense as was done in *Lohrke* and *Potter*, while refusing to extend this same treatment to the section 165 (c) (2) expense incurred by the petitioners herein.

Respondent's reliance on *Nelson*, as to the legal expense issue is misplaced. In that case the disallowed legal expenses were incurred by the corporation in connection with loans made to benefit the corporation. See *Frank Nelson, Jr.*, T.C. Memo. 1958–179. Those expenses were incurred long before the question of liability on the guarantee arose and in no way related to the guarantor's attempts to reduce his ultimate loss on the guarantee agreement.

Two items remain for disposition. These are the fees which petitioners characterized as agent's fees paid to accountants and attorneys for their services in selling Nova's assets. These fees are not the type of legal expenses encompassed by the rule in *Lloyd-Smith* and *Stamos*.

Expenses such as these are related to the sale of Nova's capital and section 1231 assets and are properly capitalized. See *Spangler* v. *Commissioner*, 323 F. 2d 913, 921 (C.A. 9, 1963),affirming a Memorandum Opinion of this Court; *Fred Wong Gunn*, 49 T.C. 38 (1967) ; and *Chapin* v. *Commissioner*, 180 F. 2d 140 (C.A. 8, 1950), affirming 12 T.C. 235 (1949).

Aside from the characterization of these expenses, we do not believe that the same proximate relationship exists between these agent's fees and petitioners' guarantor liability as existed in the Tex-Tool legal expense item. These items were improperly deducted by petitioners.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*