LLOYD W. GOLDER, JR. and ESTHER B. GOLDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Golder v. Commissioner
Docket No. 8354-71.
United States Tax Court
T.C. Memo 1976-150; 1976 Tax Ct. Memo LEXIS 254; 35 T.C.M. (CCH) 680; T.C.M. (RIA) 760150; May 17, 1976, Filed *254 Petitioners guaranteed notes of their corporation. Upon default in payment by the corporation, petitioners paid interest on the outstanding indebtedness and deducted such payments on their income tax return. Held, under the rationale of Putnam v. Commissioner,352 U.S. 82 (1956), petitioners are relegated to the exclusive provisions of section 166 in attempting to deduct the interest payments made on the notes of their corporation. No deduction is allowed under section 163(a). Held,further, no deduction is allowed under section 166 because the debt in favor of petitioners was not shown to be worthless either in whole or in part. G. Eugene Isaak, for the petitioners. Dennis C. DeBerry, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent has determined the following deficiencies in petitioners' Federal income tax: Year Ended
Deficiency
12-31-60
$ 7,905.48
12-31-62
2,207.31
12-31-66
17,443.95
12-31-67
15,595.92
Various concessions having been made, the issues remaining for our decision are whether petitioners are primarily or secondarily liable for the interest accruing on a loan made to their corporation by a third party, and whether petitioners *255 are entitled to interest deductions under section 163 of the Internal Revenue Code of 1954[1] for the interest paid by them in 1966 and 1967.
FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Lloyd W. Golder, Jr., and Esther B. Golder, husband and wife, resided in Oracle, Ariz., at the time of filing the petition in the present case. Federal income tax returns for the calendar years 1962, 1966 and 1967 were filed by petitioners with the District Director of Internal Revenue at Phoenix, Ariz. Petitioners' Federal income tax return for the year 1960 was filed with the District Director of Internal Revenue at Chicago, Ill.
Together, petitioners are majority shareholders of Rancho Vistoso, Inc. (hereafter referred to as Rancho Vistoso), an Arizona corporation incorporated on June 1, 1961. Rancho Vistoso was engaged in cattle ranching during the years relevant to this litigation. As of the date of incorporation, *256 petitioners each owned 28.57 percent of the total 1,000 shares of Rancho Vistoso stock issued for a combined ownership of 57.14 percent. On or about June 30, 1965, petitioners acquired 214.3 shares of Rancho Vistoso stock from their daughter, giving them collectively 78.57 percent of the outstanding stock. The remaining 21.43 percent of such stock was owned by petitioners' son. Petitioner Esther B. Golder was secretary-treasurer of Rancho Vistoso, as well as a member of the board of directors during all the years relevant to this litigation. Petitioner Lloyd M. Golder, Jr., was president of the corporation and a member of the board of directors for the same period of time. Besides their involvement in the operations of Rancho Vistoso, petitioners also engaged in cattle ranching on several other ranches owned by them in Arizona. On June 19, 1965, Rancho Vistoso borrowed $1,500,000 from The Sixty Trust (hereafter sometimes referred to as the Trust), a trust established on December 28, 1945, and having its offices in Providence, R.I. Interest on the loan was to accrue at ten percent per annum. Rancho Vistoso executed four promissory notes as evidence of this loan, and as security, *257 executed a mortgage on all the real property owned by the corporation including leases of Federal and State grazing land. The property subject to the mortgage was worth at least $1,250,000 and possibly as much as $1,500,000, but we need not find a precise value here. In addition to the mortgage executed by Rancho Vistoso, the Trust required petitioners and others, as individuals, to execute an agreement entitled "GUARANTY". The agreement makes all cosigners thereof jointly and severally liable for payment of the outstanding indebtedness on the notes executed by Rancho Vistoso, in the event of the latter's default in such payment. Pertinent provisions of this "GUARANTY" are as follows: FOR GOOD AND VALUABLE CONSIDERATION, the undersigned, jointly and severally, hereby absolutely and unconditionally guarantee and promise to pay the Promissory Note of even date herewith, including both principal and interest thereon, and any extension or renewal thereof, made by Rancho Vistoso, an Arizona corporation (hereinafter called the "Maker"), and payable to Royal Little, Rupert C. Thompson, Jr., and George William Miller, Trustees of The Sixty Trust under Trust Agreement dated as of December *258 28, 1945, as amended, (hereinafter collectively called the "Trust"), in the principal amount of One Million Two Hundred Thousand Dollars ($1,200,000), and principal and interest of further promissory notes from Maker to the Trust in the aggregate principal amount of not to exceed Three Hundred Thousand Dollars ($300,000). Such notes are hereinafter collectively referred to as the "Notes", and individually referred to as a "Note". This Guaranty is a guaranty of payment rather than a guaranty of collection, and the undersigned, jointly and severally, promise that, upon any default by the Maker in the payment of principal or interest of a Note or in the performance of any other obligation of a Note, any Mortgage securing repayment of any Note and upon demand made by the holder of any Note, they will pay to such holder the total amount of such principal or interest (or both) and any other sums then due under the terms of such Note or Mortgage. As security for performance of their obligations hereunder, each of the undersigned has mortgaged to the Trust property in Pima, Pinal or Cochise counties in the State of Arizona. In the event of any default by the Maker in the performance of *259 its obligations secured hereby, a separate action or actions may be brought and prosecuted against any one or more of the undersigned, or any one or more of said mortgages may be foreclosed in the full amount of the indebtedness guaranteed, or in any portion thereof, at the option of the Trust, whether or not action is brought against the Maker and whether or not the Maker be joined in any such action or actions, and without notice to or demand upon the Maker; and the undersigned waive the benefit of any statute of limitations affecting their liability hereunder or the enforcement thereof. * * * Upon any default on any Note, any holder of such Note may, at its option, proceed directly and at once, without notice or demand, against any one or more of the undersigned to collect and recover the full amount of such Note hereby guaranteed, or any portion thereof, without proceeding against or giving notice to or making demand upon the Maker or any other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying any property, real or personal, securing the Notes (or any renewals or extensions thereof) or this Guaranty. * * * Until all indebtedness of the *260 Maker to the Trust shall have been paid in full, the undersigned shall not assert any right of subrogation, and each of the undersigned waives any right to enforce any remedy which the Trust now has or may hereafter have against Maker, unless such assertion or enforcement is necessary to avoid such claim or remedy being lost by passage of the time prescribed by the applicable statute of limitations in which event all payments to the undersigned and rights acquired by the undersigned shall be held trustee for the Trust and be paid over or assigned to the Trust on account of any indebtedness of Maker to the Trust but without reducing or affecting in any manner the liability of any of the undersigned under the other provisions of this guaranty, and waives any benefit of, and any right to participate in any security now or hereafter held by the Trust. * * * This Guaranty Agreement is hereby expressly declared to be delivered by the undersigned to the Trust in the State of Rhode Island, is to be performed in said State as a contract made under the laws thereof for all purposes, and is to be construed and governed in accordance with the laws thereof. * * * To secure their promises under *261 the "GUARANTY", petitioners executed mortgages on real property owned by them and having a value of approximately $1 million. Petitioners had contemplated taking the loan in their own name, but because the parties involved believed the Arizona usury laws limited the interest rate on loans to individuals to either percent, the loan was made to Rancho Vistoso. The purpose of the Rancho Vistoso loan was to pay off pre-existing loans to third parties, to finance operations of Rancho Vistoso, and to assist petitioners' son in building a dam on recreation land. In 1966 Rancho Vistoso failed to make interest payments due on the loan. Whereupon petitioners paid The Sixty Trust $132,945 as interest on the notes executed by Rancho Vistoso and deducted such amount on their 1966 income tax return.
Similarly, in 1967 Rancho Vistoso again failed to make interest payments then due, and petitioners paid $45,203 to The Sixty Trust and deducted such amount on their 1967 income tax return. Respondent has disallowed both deductions on the ground that the interest paid was interest on the debt of another and not deductible under section 163. On December 29, 1967, Rancho Vistoso executed a deed in lieu *262 of foreclosure in favor of The Sixty Trust on all the deeded land owned by the corporation as well as all its personal property and a State grazing lease. The Trust accepted such property in cancellation of $1,250,000 of the total indebtedness of $1,540,558.53, leaving a principal indebtedness of $290,558.53 outstanding. Rancho Vistoso has continued in existence up to the date of trial of this case. No claim has been made by either party, nor do we find, that Rancho Vistoso was insolvent at any time during the years relevant to this litigation. Petitioner has claimed that Rancho Vistoso was unable to pay its obligations on the notes to The Sixty Trust, but this claim seems to refer more to the amount of cash and other liquid assets available for such payments, rather than to a claim that the corporation was insolvent. OPINION The issues remaining for our decision are whether petitioners are primarily or secondarily liable for the interest payments accuring on the loan made with The Sixty Trust, and whether petitioners are entitled to deductions under section 163(a) for the interest payments made by them in 1966 and 1967.
Petitioners contend that the nature of the "GUARANTY" agreement *263 executed by them makes them primarily liable on the loan rather than only secondarily liable, and consequently, the interest payments made by them are deductible under section 163(a). They argue that the agreement is a "guaranty of payment" rather than a "guaranty of collection," and that they have no rights of subrogation under the agreement until The Sixty Trust is paid in full. For these reasons they feel their liability differs from most guarantors in that they are really primarily liable on the loan in question. Alternatively, petitioners argue that even if they are secondarily liable for debt owed the Trust, they are entitled to interest deductions under section 1.163-1(b), Income Tax Regs., for interest paid on a mortgage on which petitioners have "equitable liability." Respondent contends that the "GUARANTY" agreement is exactly what it purports to be: a guaranty. As such, petitioners are only secondarily liable for the interest payments on such loan and may not deduct them under section 163(a) or section 1.163(b)(1), Income Tax Regs. We agree with respondent. Section 163(a) states: "There shall be allowed as a deduction all interest paid or accrued within the taxable year *264 on indebtedness." It has long been established that for interest payments to be deductible, the indebtedness must be that of the taxpayer. Chester A. Sheppard,37 B.T.A. 279 (1938). Therefore, where the taxpayer pays interest on the indebtedness of another, no deduction is allowed. The "GUARANTY" agreement executed by petitioners makes reference to payment by petitioners in the event of default by Rancho Vistoso on any of its obligations under the promissory notes executed by it. Whether this makes petitioners primarily or secondarily liable is a question of local law. Mozelle Rushing,58 T.C. 996, 999 (1972); Bert W. Martin,52 T.C. 140, 143 (1969), affd. per curiam 424 F. 2d 1368 (9th Cir. 1970), certiorari denied 400 U.S. 902 (1970). See also M. Seth Horne,59 T.C. 319, 333 (1972), affd. 523 F.2d 1363 (9th Cir. 1975). Petitioners have not cited any applicable state law and respondent has made reference only to several cases and statutes of Arizona law.
Initially, we have a problem of which state law to apply. The agreement itself states that Rhode Island law is to be the applicable law governing the interpretation of the "GUARANTY" agreement. In the absence of anything else *265 we would tend to think that since Rhode Island law governed the rights of the parties under the agreement it should also control our interpretation of petitioners' liability under the agreement for Federal income tax purposes. However, neither party has shown us that any conflict of laws between Arizona and Rhode Island exists, nor have we been able to discover any conflict on our own, and consequently we do not have to resolve a choice of law issue. Our own investigation of both Arizona and Rhode Island law indicates that petitioners are not primarily liable on the loan to Rancho Vistoso, but rather only secondarily liable as guarantors of payment of such loan.
In Dykes v. Clem Lumber Co.,58 Ariz. 176, 180, 118 P.2d 454, 455 (1941), the Supreme Court of Arizona defined the term "guaranty": A guaranty is a collateral promise by one person to answer for the payment of some debt or the performance of some duty in the case of the default of a third party who, in the first instance, is liable for such payment or performance. [Emphasis supplied.] Petitioners' agreement comes within this definition in that their liability would accrue under the agreement only in the event of default in *266 payment by Rancho Vistoso, the principal obligor. Consequently, petitioners will be considered secondarily liable as guarantors of Rancho Vistoso's debt for purposes of the Federal income tax laws. Cf. Ambrosino v. Rhode Island Hospital Trust Co.,92 R.I. 282, 168 A.2d 165 (1961). The distinction sought by petitioners between a "guaranty of payment" and a "guaranty of collection," we think, is irrelevant to the issue here, as in either case liability is contingent upon default of the original obligor and as such petitioners are only secondarily liable. [2]
Petitioners cite us to Kate Baker Sherman,18 T.C. 746 (1952), for the proposition that even though they are guarantors of the obligations of their corporation, an interest deduction under section 163(a) is appropriate. In Sherman this Court allowed the taxpayer therein to deduct interest payments made under an obligation as endorser and guarantor of her spouse's promissory note. At the time the payments were made the principal obligor (the taxpayer's husband) was insolvent, and we concluded that the taxpayer was actually satisfying her own obligations (albeit as guarantor) when she made *267 the interest payments. 18 T.C. at 754. Although the Sherman case has similarities to the present case, this Court has previously indicated it is no longer controlling on this issue. Mozelle Rushing,supra at 999-1000. Subsequent to our decision in Sherman, the Supreme Court in Putnam v. Commissioner,352 U.S. 82 (1956), ruled that losses sustained by a guarantor were properly deductible under the predecessor of section 166 (bad debt losses) rather than under the predecessor of section 165(c)(2) (losses incurred in a transaction entered into for profit, though not connected with a trade or business). The Court reasoned that upon payment a guarantor is immediately subrogated to the rights of the creditor and becomes a creditor himself of the primary obligor. Any resulting loss to the guarantor arises from the worthlessness of the debt now owed to the guarantor and consequently the payments must be treated as bad debt losses rather than losses incurred in a transaction entered into for profit. [3] *268 However, nothing was said in Putnam about deducting a portion of the payments made by the guarantor as interest on indebtedness.
The Fifth Circuit, in Nelson v. Commissioner,281 F. 2d 1 (5th Cir. 1960) has extended the Putnam rule and denied an interest deduction to any portion of the payment made by a guarantor allocable to interest on the indebtedness of the principal obligor. The court stated: The question as to the allowance of deductions by Nelson of the interest and expense items paid by him as a guarantor or surety depends for its answer upon the scope of the Putnam rule. * * * [281 F. 2d at p. 4.] The court reasoned that interest on indebtedness is a debt no different from principal and, therefore, the two should be treated the same. Referring to interest, they said: * * * It is an incident of the principal and when accrued and payable is an indebtedness no different from that of the principal. * * * We reach the conclusion that the obligations of Southwest [the primary obligor] for interest were debts to the same extent and of the same kind as its obligations to pay principal. From this it follows, we think, that the Taxpayer [Nelson] must be denied an interest deduction under Section 23 [now section 163(a)], *269 and must content himself with the short-term capital loss which the Commissioner has allowed. * * * [281 F. 2d at pp. 5-6.] As a general matter deductions under section 163(a) are very different from deductions under section 166. Section 163(a) is concerned with debts (interest) owed by the taxpayer to another, while section 166 is concerned with debts owed to the taxpayer. A problem arises in a guarantor situation, however, because the guarantor is both a debtor and a creditor. Upon default of the primary obligor, the guarantor is called upon for payment. He is contractually bound to pay the sums owed, as any debtor. There is a substantial difference, however, between the debt of the guarantor and that of the primary obligor. Upon payment, the guarantor is immediately subrogated to the rights of the creditor and thereby becomes a creditor himself. For the guarantor, the transaction does not close upon his making payment to the creditor because of this right of reimbursement from the primary obligor.Cf. John E. Montgomery,65 T.C. 511, 517-518 (1975). Rather, the transaction closes when the guarantor receives payment from the primary obligor or the debt becomes worthless. While *270 the debt may become worthless at the time of subrogation, as in Putnam, this need not always be the case. Indeed, in the present case no contention has been made that Rancho Vistoso was ever insolvent or that its obligations were worthless. Any loss sustained by the gurantor is a result of the primary obligor's failure to reimburse the guarantor after subrogation. See Estate of Dominick F. Pachella,37 T.C. 347, 354 (1961), affd. 310 F. 2d 815 (3d Cir. 1962).It is for this reason that the Supreme Court, in Putnam, concluded that guarantor losses generally are to be treated as bad debt losses rather than losses incurred in a transaction entered into for profit. W. D. Roussel,37 T.C. 235, 243 (1961). Viewed in this manner the loss arises from a debt owed to the guarantor and not because of a debt owed by the guarantor. Consequently, we conclude the loss must be treated for tax purposes under the exclusive provisions of section 166 and cannot be deducted under section 163(a). As stated in Putnam,supra:
Here also the statutory scheme is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not *271 at all. [352 U.S. at p. 88.] [4]
We have considered this issue before, as to whether guarantor losses may be deducted in part as interest on indebtedness, and decided the question the same way we have here. Mozelle Rushing,supra at 1000; Eskimo Pie Corporation,4 T.C. 669, 675 (1945), affd. 153 F. 2d 301 (3d Cir. 1946); William H. Simon,36 B.T.A. 184 (1937). We have expressed our views herein only to *272 supplement our reasoning in those decisions and we affirm them in all respects. The Rushing,Eskimo Pie, and Simon decisions held the interest paid by a guarantor on indebtedness was not on the indebtedness of the guarantor, but rather on the indebtedness of the primary obligor. That is, the interest accrued on the indebtedness of the primary obligor during a time when the guarantor's liability was secondary or contingent. Therefore, the interest paid by the guarantor was not upon his own indebtedness and was not deductible under section 163(a) or its predecessors. [5]
Petitioners argue that their obligations under the "GUARANTY" agreement are altered by the limits on their rights of subrogation contained therein.They contend that their limited rights of subrogation make them primarily liable on the indebtedness. We have already concluded that petitioners are secondarily liable as guarantors of their corporation's debt. We do not feel the limits placed on petitioners' rights of subrogation alter petitioners' secondary or contingent liability. Consequently, we cannot conclude that such *273 limits alter their status as guarantors. However, the right of subrogation was apparently a key factor in the Supreme Court's decision in Putnam,supra, characterizing guarantor losses as bad debt losses, deductible, if at all, under the predecessor of section 166. Though petitioners have not raised the issue directly, we feel it necessary to discuss their limited rights of subrogation in relation to the Putnam rationale. In Mozelle Rushing,supra, we recognized that not all losses or expenses incurred by a guarantor in his capacity as such were precluded from treatment under provisions of the Code other than section 166. We stated: First, it should be noted that Putnam did not foreclose guarantor transactions from being transactions entered into for profit. See the concurring opinion in Bert W. Martin,52 T.C. 140, 147 (1969), affirmed per curiam 424 F. 2d 1368 (C.A. 9, 1970), certiorari denied 400 U.S. 902 (1970). See also Santa Anita Consolidated, Inc.,50 T.C. 536, 559 (1968). It is still possible in many circumstances to consider payments resulting from guarantor transactions as payments made in a transaction entered into for profit. Indeed, in numerous post-Putnam cases, *274 this Court has held that certain payments which had their genesis in petitioners' status as guarantors were payments which resulted in losses incurred in a transaction entered into for profit, deductible under section 165(c)(2). * * * [58 T.C. at 1001.] While, at first glance, this might appear to be a collateral issue we need not go into, because no deduction was asked for under section 165(c)(2), we have reasoned above that because a debt arises in favor of a guarantor upon payment under his guaranty, his loss is a bad debt loss, deductible as such or not at all.Absent such a debt arising in favor of the guarantor, he may not be restricted to the exclusive provisions of section 166 in seeking a tax deduction. The cases that follow shed light on the necessity of a right of subrogation in characterizing guarantor losses as bad debt losses. One of the cases relied on by this Court in Mozelle Rushing,supra, was Eugene H. Rietzke,40 T.C. 443 (1963), appeal dismissed (4th Cir. February 25, 1964). In Rietzke, the taxpayer had sought to deduct payments made as a guarantor in partial satisfaction of the debt owed to the creditor. Under the applicable New Jersey law, as a protection *275 to the creditor, the guarantor was not subrogated to the rights of the creditor until the creditor had been paid in full. After analyzing the Putnam decision, we held: * * * Inasmuch as there was less than full payment of the debts owed to Fidelity and Commerce in the instant case, and since petitioner obtained no right of subrogation in law or by contract, the payments he made pursuant to the contract of December 28, 1953, [i.e., the guaranty] do not fall within the ambit of the bad debt provisions of the internal revenue laws. We believe that petitioner's losses are deductible under the provisions of section 23(e)(2) of the Internal Revenue Code of 1939 and section 165(c)(2) of the Internal Revenue Code of 1954. These sections provide that an individual may deduct losses incurred in a transaction entered into for profit, though not connected with a trade or business. * * * [40 T.C. at 452.] See also M. Seth Horne,supra at 333; the concurring opinion in Bert W. Martin,supra at 147; and Santa Anita Consolidated,Inc.,50 T.C. 536, 559 (1968). [6] *276 The majority opinion in Bert W. Martin,supra at 145, expressed the view that subrogation was not an essential element in treating guarantor losses as bad debt losses. We stated that Putnam should be read broadly to treat guarantor losses as bad debt losses whether or not there was a debt created by subrogation. We reasoned that whether there is partial payment or full payment of the outstanding debt by the guarantor should not make a difference in the tax treatment of the guarantor's payments. Even though subrogation occurs only in the latter case, the losses in either case are essentially investment losses and should be treated the same (under section 166). However, this was dictum in the opinion because we found in Martin that upon partial payment by the guarantor an implied contract arose under local law for the debtor to reimburse the guarantor in the amount of the latter's payments. This implied contract was a new debt in favor *277 of the guarantor (separate from any subrogated rights in the old debt) sufficient to bring his losses within the exclusive provisions of section 166.Accord, Robert E. Imel,61 T.C. 318, 326 (1973); Robert E. Gillespie,54 T.C. 1025, 1031 (1970), affd. in an unreported opinion (9th Cir. Sept. 18, 1972), 72-2 USTC par. 9742. We do not think it necessary to resolve the issue of petitioners' rights of subrogation under local law. Irrespective of any subrogated rights, we think there is an implied contract under local law in favor of petitioners sufficient to bring their losses within the exclusive ambit of section 166. Bert W. Martin,supra at 143. The Supreme Court of Arizona in Dykes v. Clem Lumber Co.,supra, stated: * * * The general rule of law in regard to guaranty is that where one has entered into a contract of guaranty at the request of a principal debtor and has been compelled to pay his principal's debt, there is an implied promise of reimbursement, and on the payment of the debt the guarantor has an immediate right of action against the principal for the amount which he has thus been compelled to pay. [58 Ariz. at 180, 118 P. 2d at 455.] Neither party has cited any Rhode *278 Island law, nor have we been able to find any which is dispositive of this issue. Looking to general case law, treatises and restatements for assistance, as we did in M. Seth Horne,supra at 333, we see that the Arizona law just quoted comports with the general rule in this area and we find it applicable here. As stated in 73 Am. Jur. 2d, Subrogation, par. 134, p. 686: A surety paying the debt of the principal is not confined to his remedy by way of subrogation. Although, as stated above, he has a right to prosecute an action on the very debt itself, he may also pursue his legal remedies and bring an action on an assumpsit, or the obligation implied by law in his favor for reimbursement by the principal.n74 [Footnote omitted.] Since we have concluded petitioners are entitled to reimbursement from their corporation (the principal obligor) for the payments made by them on their guaranty, the proper tax treatment for losses sustained with respect to such payments must be found within the parameters of section 166, not section 163. [7] *279 Because petitioners are relegated to the exclusive provisions of section 166 to deduct their losses, we find it unnecessary to reach their alternative argument that although they are only secondarily liable on the notes of their corporation, they are still entitled to an interest deduction under section 1.163-1(b), Income Tax Regs.
However, it remains for us to decide whether petitioners are entitled to a deduction under section 166. *280 They have not contended that they are, and indeed, we can understand such reluctance, for the debt owed to petitioners by their corporation under the implied contract theory has never been shown to be worthless (either in whole or in part). The corporation was never insolvent during the years in issue and continued to operate as a viable economic entity up to the date of trial. Although there is some indication that the cash and other current liquid assets available were insufficient to pay off current debts, there has been no claim or showing that the fixed assets of the corporation were insufficient to secure all its debts. Absent a showing that the debt was worthless in whole or in part, we must conclude petitioners are not entitled to any deduction with respect to the payments made by them as guarantors of their corporation's notes.
Because of concessions, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect for the years in issue, unless otherwise noted.↩
2. See Earl E. Cloud,T.C. Memo. 1974-131↩.
3. In Spring City Co. v. Commissioner,292 U.S. 182 (1934), the Supreme Court held the predecessors of sections 166 and 165(c)(2)↩ to be mutually exclusive.
4. We note that this rationale has been used to hold that section 166 is mutually exclusive from sections 162 and 212 as well as section 165.That is, where a creditor-debtor relationship arises upon payment by a guarantor, the loss sustained may be deducted, if at all, only under section 166, and these other sections are not applicable. M. Seth Horne,supra;Estate of Martha Byers,57 T.C. 568, 574-575 (1972), affd. per curiam 472 F. 2d 590 (6th Cir. 1973); W. D. Roussel,supra at p. 244. We recognize there may be a contrary implication from our decision in Ray A. Myers,42 T.C. 195, 210-211 (1964), but since we held the loss there was attributable to a business bad debt and could be deducted under section 166↩, it was unnecessary to our decision to say section 162 was also applicable.
5. See P. P. Griffin,7 B.T.A. 1094 (1927); Earl E. Cloud,supra;Rev. Rul. 74-592, 1974-2 C.B. 47↩.
6. Compare Charles R. Iden,T.C. Memo. 1974-81, fn. 2; and Morris B. Parker,T.C. Memo. 1974-60, with W. L. Hardee,T.C. Memo. 1975-129. See also J. Meredith Siple,54 T.C. 1, 8 (1970); D. J. Condit,40 T.C. 24, 29 (1963), affd. 333 F. 2d 585 (10th Cir. 1964); J. J. Shea,36 T.C. 577, 583 (1961), affd. per curiam 327 F. 2d 1002 (5th Cir. 1964); Merle W. Nicewander,T.C. Memo. 1975-234↩.
7. We note that, barring stipulation to the contrary, an appeal from our decision herein will go to the Court of Appeals for the Ninth Circuit.That court has already expressed its views on the issue of subrogation with respect to bad debt losses and concluded that subrogation is not a necessary element in treating guarantor losses as bad debt losses. United States v. Hoffman,423 F. 2d 1217 (9th Cir. 1970), relying on Stratmore v. United States,420 F. 2d 461 (3d Cir. 1970). See also Horne v. Commissioner,523 F.2d 1363 (9th Cir. 1975) [75-2 USTC [*] 9744], affg. 59 T.C. 319 (1972).Consequently, even if we were to decide petitioners had no right of subrogation upon partial payment of their corporation's debt, their losses would nonetheless have to be treated as bad debt losses under section 166. Jack E. Golsen,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), certiorari denied 404 U.S. 940↩ (1971)